Floydist James MARTIN, et al., Plaintiffs,

v.

William A. ALLAIN, Governor of Mississippi, et al., Defendants.

Henry KIRKSEY, et al, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

William A. ALLAIN, Governor of Mississippi, et al., Defendants.

Civ. A. Nos. J–84–0708(B), J–85–0960(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

April 1, 1987.

Ellis Turnage, Morris & Turnage, Cleveland, Miss., Julius L. Chambers (pro hac vice), James M. Nabrit, III, Deborah Fins, NAACP Legal Defense Fund, New York City, Robert B. McDuff, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., Pamela S. Karlan (pro hac vice), NAACP Legal Defense & Educational Fund, Inc., New York City, for plaintiffs.

Carroll Rhodes, Hazlehurst, Miss., William L. Robinson, Frank R. Parker, Samuel Issacharoff, Lawyers Committee for Civil Rights Under Law, Washington, D.C., Johnnie L. Walls, Jr., Walls, Buck and Irving, Greenville, Miss., for Kirksey, et al., plaintiffs.

James Craig, Jackson, Miss., for Hinds Co. Democratic Executive Comm.

Charles H. Evans, Dyre & Evans, Jackson, Miss., for Hinds County Repub. Ex. Comm.

Stephen J. Kirchmayr, Asst. Atty. Gen., Jackson, Miss., for State defendants.

Hubbard T. Saunders, IV, Crosthwait, Terney & Noble, Jackson, Miss., for State defendants and Yazoo County Election Comm.

Haley Barbour, Wiley J. Barbour, Henry, Barbour & Decell, Yazoo City, Miss., for Yazoo County Republican Exec. Comm.

BARBOUR, District Judge.

## MEMORANDUM OPINION AND ORDER

Invoking the court's federal question and civil rights subject matter jurisdiction, the named *Martin* and *Kirksey* plaintiffs, black citizens and registered voters of the State of Mississippi, bring these two consolidated voting rights actions individually and on behalf of two Federal Rules of Civil Procedure 23(b)(2) plaintiff classes previously defined by the court in its order of March 8, 1985, in *Martin* as "all present and future black citizens and black qualified electors of Hinds County and Yazoo County, Mississippi" and in its order of January 23, 1986, in *Kirksey* as "all present and future black citizens and black qualified electors of the State of Mississippi." They challenge the at-large, numbered post election methods used to elect the county judges by separate places in Harrison, Hinds, and Jackson Counties, Mississippi, the multi-member districts used to elect the chancellors from separate places in all Mississippi Chancery Court Districts and the multi-member districts used to elect the circuit judges from separate places in all Mississippi Circuit Court Districts. Although the plaintiffs also challenge the district lines themselves for the chancery and circuit court districts in their First Amended Complaint, they presented no proof on this issue and did not address it in final arguments.

The plaintiffs allege that the challenged statutes violate their rights secured by Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973, the Fourteenth and Fifteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983, because they have not been precleared as allegedly required by Section 5, because they are allegedly adopted and are allegedly being maintained for the racially discriminatory purpose of diluting, minimizing, and cancelling out black voting strength, and because they allegedly result in a denial or abridgement of the right of plaintiffs and other black citizens to vote on account of race or color because black citizens allegedly have less opportunity than white citizens to participate in the political process and to elect representatives of their choice.

The plaintiffs requested the convening of a three-judge district court to hear and determine their Section 5 claims, declaratory judgments that the three challenged election systems violated plaintiffs' rights under the previously mentioned federal statutes and constitutional provisions, preliminary and permanent injunctive relief enjoining the defendants from holding any further primary or general elections under the challenged statutes, injunctive relief ordering into effect plans for the election of

judges from single-member districts which do not dilute black voting strength and which remedy the violations alleged by the plaintiffs, a court-ordered award of court costs, litigation expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. §§ 19731(e) & 1988, and such other relief as may be just and equitable.

By Order filed on April 3, 1986, the three-judge district court previously convened in the *Kirksey* action pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, determined that Section 5 applied to the election of state court judges and enjoined the defendants from implementing a number of Mississippi statutes involving the circuit, chancery, and county court systems unless and until they were precleared under Section 5. *Kirksey v. Allain*, 635 F.Supp. 347 (S.D. Miss.1986) (three-judge court). By letter dated July 1, 1986, the U.S. Attorney General, through his designated representative, precleared a number of those statutes. However, the Attorney General did interpose a Section 5 objection to the utilization of the post feature for the election of judges in certain judicial districts which became multi-judge for the first time after November 1, 1964, the effective date of Section 5 coverage for the State of Mississippi.

Following an evidentiary hearing on May 27, 1986, and through an order filed on May 28, 1986, the Court in *Kirksey* granted the *Kirksey* plaintiffs' motion for preliminary injunction and preliminarily enjoined the defendants from conducting elections for the offices of circuit judge in the State of Mississippi, chancery judge in the State of Mississippi, and county judge in only Harrison, Hinds, and Jackson Counties, Mississippi.

Joined as defendants in these actions are Governor William A. Allain, Attorney General Edwin Lloyd Pittman and Secretary of State Dick Molpus in their official capacities and as members of the State Board of Election Commissioners; the Hinds County Board of Election Commissioners; the Yazoo County Board of Election Commissioners; the Hinds County Democratic Party Executive Committee; the Hinds County Republican Party Executive Committee; the Yazoo County Democratic Party Executive Committee; and the Yazoo County Republican Party Executive Committee. By previous orders of the Court, the Republican and Democratic Parties and the party executive committees for Hinds and Yazoo Counties have been relieved of the duties of any further appearances and participation in this case. The remaining defendants have denied that the plaintiffs are entitled to the relief which they seek.

Following discovery, the consolidation of the *Martin* and *Kirksey* actions pursuant to Rule 42 of the Federal Rules of Civil Procedure by Order dated August 22, 1986, a pretrial conference, and the entry of a Pre-trial Order, these two consolidated actions were tried before the United States District Judge, without a jury, from March 9 to March 13, 1987, in Jackson, Mississippi. Having considered the oral and documentary proof received at trial, the parties' pre-trial briefs and proposed findings of fact and conclusions of law, and their final arguments, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure and in accordance with the appropriate district-by-district analysis mandated by the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. ——, —— n. 28, 106 S.Ct. 2752, 2271 n. 28, 92 L.Ed.2d 25, 52 n. 28 (1986), and the Fifth Circuit's requirement of detailed findings of fact in cases alleging vote dilution, *Velasquez v. City of Abilene*, 725 F.2d 1017, 1020–21 (5th Cir.1984).

### FINDINGS OF FACT

#### General

1. The named *Kirksey* plaintiffs are black, adult, resident citizens and voters of the State of Mississippi, residing in various counties and judicial districts. By Order filed on January 23, 1986, the *Kirksey* action was certified as a plaintiff class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) on behalf of a plaintiff class defined as "all present and future

black citizens and black qualified electors of the State of Mississippi."

2. Named *Martin* plaintiffs are black, adult, resident citizens and electors of Hinds County, Mississippi, and reside in the Fifth Chancery Court District and the Seventh Circuit Court District. By Order filed on March 8, 1985, the *Martin* action was certified as a plaintiff class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) on behalf of a plaintiff class defined as "all present and future black citizens and black qualified electors of Hinds County and Yazoo County, Mississippi."

3. The Defendants are the Governor of the State of Mississippi and other state officials and official bodies responsible for conducting elections in the state. All of the defendants are sued in their official capacities.

4. At all relevant times in this action, the defendants were and have been acting under the color of the statutes, ordinances, regulations, customs, and usages of the State of Mississippi, Hinds County, Mississippi, and Yazoo County, Mississippi.

5. Mississippi has a tiered court system. The Mississippi Supreme Court is the appellate court of last resort. It is composed of nine justices, three of whom are elected from each of the three supreme court districts into which the state is divided. Supreme court elections are district elections rather than statewide elections. Justices determine cases regardless of origin throughout the state.

6. Trial courts of unlimited jurisdiction are the chancery courts, which are courts of equity and probate, and circuit courts, which are courts of law. The state is divided into twenty chancery and twenty circuit districts. All districts are drawn according to county lines. There are two single-county chancery districts; the rest contain two to six counties each. There are thirty-nine chancery judges. Six chancery districts are single-judge districts. There is one single-county circuit district; the rest contain two to seven counties each. There are forty circuit judges. Six circuit districts are single-judge districts. In all multi-judge districts, both chancery and circuit, judges are elected in district-wide elections and to designated posts. Each judge is required to be a resident of his or her district. In some districts there are post residency requirements.

7. County courts are trial courts with the amount in controversy limited to $10,-000.00. They are optional with the individual counties. Nineteen of the eighty-two counties in the state have county judges. Sixteen have one county judge each. Hinds County has three county judges and Jackson and Harrison Counties have two each. In these three counties the county judges are elected to specific posts by county-wide vote.

8. The Mississippi constitution provides that each person eligible to hold the office of circuit judge and chancery judge must be a practicing lawyer for five years, at least 26 years of age, and a citizen of the state for five years. Miss. Const. Art. 6, § 154. County judges must meet the same qualifications as circuit judges. *Miss. Code Ann.* § 9-9-5.

9. The small claims and misdemeanor courts in Mississippi are known as Justice Courts. Each county has at least two justice court justices elected from districts by district vote. They serve on a county-wide basis regardless of the locale of the controversy within the county. There is no requirement that justice court justices be attorneys.

10. This suit involves the chancery and circuit courts statewide and the county courts of Hinds, Harrison and Jackson Counties. It does not involve the Mississippi Supreme Court or the justice courts.

11. The only district officials connected with the justice system other than judges are district attorneys who are elected from each circuit court district. Court administration and case filings are handled by chancery clerks and circuit clerks in each county who are elected in each county of the state. Venue and jurisdiction are determined by statute and in general are tied to counties.

12. The following proof was made either by stipulation in the Pre-trial Order or by Exhibits D–44 or P–16. "Black%" refers to the percentage of black population as a whole. "Black VAP" refers to black voting age population. "% of Black Attorneys Eligible" refers to the percentage of black attorneys eligible to stand for election as judge out of the total number of attorneys residing in the district. Two figures under this column represent a disagreement between the parties but with one of the figures being agreed to by each party.

### CHANCERY COURT DISTRICTS

| | Total Population | Black % | Black VAP | % Black Attorneys Eligible | No. of Black Elected Officials |
|---|---|---|---|---|---|
| **District 1** | | | | | |
| Alcorn | 33,036 | 10.4 | 9.3 | | |
| Itawamba | 20,518 | 6.2 | 5.8 | | |
| Lee | 57,061 | 20.4 | 18.0 | | |
| Monroe | 36,404 | 29.7 | 25.7 | | |
| Pontotoc | 20,918 | 15.6 | 13.8 | | |
| Prentiss | 24,025 | 10.8 | 9.3 | | |
| Tishomingo | 18,434 | 3.7 | 3.4 | | |
| Union | 21,741 | 13.8 | 12.1 | | |
| | 232,137 | 15.8 | 13.8 | 2.47 | 13 |
| **District 2** | | | | | |
| Jasper | 17,265 | 49.2 | 43.9 | | |
| Newton | 19,967 | 27.2 | 23.8 | | |
| Scott | 24,556 | 35.0 | 31.5 | | |
| | 62,788 | 36.5 | 32.3 | 4.4 | 15 |
| **District 3** | | | | | |
| DeSoto | 53,930 | 17.8 | 16.3 | | |
| Grenada | 21,043 | 41.8 | 37.4 | | |
| Montgomery | 13,366 | 40.9 | 35.3 | | |
| Panola | 28,164 | 48.9 | 42.9 | | |
| Tate | 20,119 | 38.4 | 34.5 | | |
| Yalobusha | 13,183 | 38.2 | 32.8 | | |
| | 149,805 | 33.7 | 30.1 | 1.53 | 39 |
| **District 4** | | | | | |
| Amite | 13,369 | 47.6 | 42.3 | | |
| Franklin | 8,208 | 37.2 | 32.6 | | |
| Pike | 36,173 | 43.3 | 38.3 | | |
| Walthall | 13,761 | 41.0 | 35.2 | | |
| | 71,511 | 43.0 | 37.8 | 4.91 | 24 |
| **District 5** | | | | | |
| Hinds | 250,998 | 45.1 | 40.2 | 3.84–3.39 | 25 |
| **District 6** | | | | | |
| Attala | 19,865 | 39.1 | 34.0 | | |
| Carroll | 9,776 | 45.3 | 40.4 | | |
| Choctaw | 8,996 | 28.1 | 24.5 | | |
| Kemper | 10,148 | 54.3 | 48.1 | | |
| Neshoba | 23,789 | 17.9 | 15.6 | | |
| Winston | 19,474 | 39.2 | 33.8 | | |
| | 92,048 | 34.9 | 30.5 | 0.0–1.42 | 23 |
| **District 7** | | | | | |
| Bolivar | 45,965 | 62.1 | 54.7 | | |
| Coahoma | 36,918 | 64.0 | 58.3 | | |
| Leflore | 41,525 | 59.1 | 54.2 | | |
| Quitman | 12,636 | 56.0 | 49.8 | | |
| Tallahatchie | 17,157 | 57.3 | 50.3 | | |
| Tunica | 9,652 | 73.0 | 67.1 | | |
| | 163,853 | 61.5 | 55.2 | 5.32–5.20 | 110 |

| | Total Population | Black % | Black VAP | % Black Attorneys Eligible | No. of Black Elected Officials |
|---|---|---|---|---|---|
| **District 8** | | | | | |
| Hancock | 24,496 | 9.9 | 8.8 | | |
| Harrison | 157,665 | 19.3 | 16.9 | | |
| Stone | 9,716 | 22.6 | 19.1 | | |
| | 191,877 | 18.3 | 16.0 | 1.16 | 7 |
| **District 9** | | | | | |
| Humphreys | 13,931 | 65.6 | 59.5 | | |
| Issaquena | 2,513 | 55.6 | 51.1 | | |
| Sharkey | 7,964 | 65.7 | 58.8 | | |
| Sunflower | 34,844 | 62.0 | 56.1 | | |
| Warren | 51,627 | 37.4 | 34.8 | | |
| Washington | 72,344 | 55.6 | 50.1 | | |
| | 183,223 | 52.9 | 47.8 | 6.89 | 58 |
| **District 10** | | | | | |
| Forrest | 66,018 | 26.8 | 23.3 | | |
| Lamar | 23,821 | 10.8 | 9.6 | | |
| Marion | 25,708 | 29.9 | 25.8 | | |
| Pearl River | 33,795 | 14.9 | 13.3 | | |
| Perry | 9,864 | 21.7 | 19.1 | | |
| | 159,206 | 22.1 | 19.4 | 2.89–2.95 | 16 |
| **District 11** | | | | | |
| Holmes | 22,970 | 71.1 | 64.8 | | |
| Leake | 18,790 | 34.9 | 31.0 | | |
| Madison | 41,613 | 55.9 | 50.3 | | |
| Yazoo | 27,349 | 51.4 | 46.1 | | |
| | 110,722 | 54.4 | 48.7 | 4.85–5.94 | 52 |
| **District 12** | | | | | |
| Clarke | 16,945 | 34.8 | 31.1 | | |
| Lauderdale | 77,285 | 31.4 | 27.3 | | |
| | 94,230 | 32.0 | 27.9 | 1.63–1.62 | 8 |
| **District 13** | | | | | |
| Covington | 15,927 | 34.6 | 29.7 | | |
| Jeff Davis | 13,846 | 53.6 | 48.2 | | |
| Lawrence | 12,518 | 30.9 | 27.2 | | |
| Simpson | 23,441 | 30.7 | 26.8 | | |
| Smith | 15,077 | 21.2 | 17.6 | | |
| | 80,809 | 33.6 | 29.2 | 0.0 | 15 |
| **District 14** | | | | | |
| Chickasaw | 17,851 | 36.0 | 31.8 | | |
| Clay | 21,082 | 50.0 | 45.1 | | |
| Lowndes | 57,304 | 34.2 | 29.6 | | |
| Noxubee | 13,212 | 64.6 | 59.1 | | |
| Oktibbeha | 36,018 | 34.3 | 28.8 | | |
| Webster | 10,300 | 19.6 | 16.8 | | |
| | 155,767 | 38.2 | 33.1 | 4.65–4.41 | 50 |
| **District 15** | | | | | |
| Copiah | 26,503 | 48.4 | 43.3 | | |
| Lincoln | 30,174 | 30.0 | 26.3 | | |
| | 56,677 | 38.6 | 34.2 | 2.0 | 12 |
| **District 16** | | | | | |
| George | 15,297 | 9.5 | 8.1 | | |
| Greene | 9,827 | 20.1 | 17.2 | | |
| Jackson | 118,015 | 18.7 | 16.3 | | |
| | 143,139 | 17.8 | 15.5 | 3.16 | 13 |

| | Total Population | Black % | Black VAP | % Black Attorneys Eligible | No. of Black Elected Officials |
|---|---|---|---|---|---|
| **District 17** | | | | | |
| Adams | 38,071 | 48.5 | 44.9 | | |
| Claiborne | 12,279 | 74.5 | 72.5 | | |
| Jefferson | 9,181 | 82.0 | 77.7 | | |
| Wilkinson | 10,021 | 66.9 | 63.7 | | |
| | 69,552 | 60.1 | 56.7 | 5.05–5.05 | 73 |
| **District 18** | | | | | |
| Benton | 8,153 | 37.9 | 31.7 | | |
| Calhoun | 15,664 | 25.5 | 21.5 | | |
| Lafayette | 31,030 | 26.4 | 21.6 | | |
| Marshall | 29,296 | 53.2 | 49.0 | | |
| Tippah | 18,739 | 15.9 | 13.7 | | |
| | 102,882 | 32.9 | 28.2 | 5.38–5.34 | 21 |
| **District 19** | | | | | |
| Jones | 61,912 | 23.1 | 20.6 | | |
| Wayne | 19,135 | 33.5 | 29.2 | | |
| | 81,047 | 25.6 | 22.5 | 1.05 | 10 |
| **District 20** | | | | | |
| Rankin | 69,427 | 18.6 | 17.4 | 1.75 | 3 |

## CIRCUIT COURT DISTRICTS

| | Total Population | Black % | Black VAP | % Black Attorneys Eligible | No. of Black Elected Officials |
|---|---|---|---|---|---|
| **District 1** | | | | | |
| Alcorn | 33,036 | 10.4 | 9.3 | | |
| Itawamba | 20,518 | 6.2 | 5.8 | | |
| Lee | 57,061 | 20.4 | 18.0 | | |
| Monroe | 36,404 | 29.7 | 25.7 | | |
| Pontotoc | 20,918 | 15.6 | 13.8 | | |
| Prentiss | 24,025 | 10.8 | 9.3 | | |
| Tishomingo | 18,434 | 3.7 | 3.4 | | |
| | 210,396 | 16.0 | 14.0 | 2.71 | 12 |
| **District 2** | | | | | |
| Hancock | 24,496 | 9.9 | 8.8 | | |
| Harrison | 157,665 | 19.3 | 16.9 | | |
| Stone | 9,716 | 22.6 | 19.1 | | |
| | 191,877 | 18.3 | 16.0 | 1.16 | 7 |
| **District 3** | | | | | |
| Benton | 8,153 | 37.9 | 31.7 | | |
| Calhoun | 15,664 | 25.5 | 21.5 | | |
| Chickasaw | 17,851 | 36.0 | 31.8 | | |
| Lafayette | 31,030 | 26.4 | 21.6 | | |
| Marshall | 29,296 | 53.2 | 49.0 | | |
| Tippah | 18,739 | 15.9 | 13.7 | | |
| Union | 21,741 | 13.8 | 12.1 | | |
| | 142,474 | 30.4 | 26.1 | 4.34–4.32 | 27 |
| **District 4** | | | | | |
| Holmes | 22,970 | 71.1 | 64.8 | | |
| Humphreys | 13,931 | 65.6 | 59.5 | | |
| Leflore | 41,525 | 59.1 | 54.2 | | |
| Sunflower | 34,844 | 62.0 | 56.1 | | |
| Washington | 72,344 | 55.6 | 50.1 | | |
| | 185,614 | 60.3 | 54.7 | 6.97–7.04 | 76 |

| | Total Population | Black % | Black VAP | % Black Attorneys Eligible | No. of Black Elected Officials |
|---|---|---|---|---|---|
| **District 5** | | | | | |
| Attala | 19,865 | 39.1 | 34.0 | | |
| Carroll | 9,776 | 45.3 | 40.4 | | |
| Choctaw | 8,996 | 28.1 | 24.5 | | |
| Grenada | 21,043 | 41.8 | 37.4 | | |
| Montgomery | 13,366 | 40.9 | 35.3 | | |
| Webster | 10,300 | 19.6 | 16.8 | | |
| Winston | 19,474 | 39.2 | 33.8 | | |
| | 102,820 | 37.6 | 32.8 | 1.11–2.19 | 26 |
| **District 6** | | | | | |
| Adams | 38,071 | 48.5 | 44.9 | | |
| Amite | 13,369 | 47.6 | 42.3 | | |
| Franklin | 8,208 | 37.2 | 32.6 | | |
| Jefferson | 9,181 | 82.0 | 77.7 | | |
| Wilkinson | 10,021 | 66.9 | 63.7 | | |
| | 78,850 | 53.4 | 49.1 | 4.16–5.10 | 61 |
| **District 7** | | | | | |
| Hinds | 250,998 | 45.1 | 40.2 | | |
| Yazoo | 27,349 | 51.4 | 46.1 | | |
| | 278,347 | 45.8 | 40.7 | 3.85–3.49 | 30 |
| **District 8** | | | | | |
| Leake | 18,790 | 34.9 | 31.0 | | |
| Neshoba | 23,789 | 17.9 | 15.6 | | |
| Newton | 19,967 | 27.2 | 23.8 | | |
| Scott | 24,556 | 35.0 | 31.5 | | |
| | 87,102 | 28.5 | 25.3 | 3.17 | 8 |
| **District 9** | | | | | |
| Claiborne | 12,279 | 74.5 | 72.5 | | |
| Issaquena | 2,513 | 55.6 | 51.1 | | |
| Sharkey | 7,964 | 65.7 | 58.8 | | |
| Warren | 51,627 | 37.4 | 34.8 | | |
| | 74,383 | 47.2 | 44.2 | 6.73–5.88 | 48 |
| **District 10** | | | | | |
| Clarke | 16,945 | 34.8 | 31.1 | | |
| Kemper | 10,148 | 54.3 | 48.1 | | |
| Lauderdale | 77,285 | 31.4 | 27.3 | | |
| Wayne | 19,135 | 33.5 | 29.2 | | |
| | 123,513 | 34.0 | 29.7 | 1.45–1.44 | 16 |
| **District 11** | | | | | |
| Bolivar | 45,965 | 62.1 | 54.7 | | |
| Coahoma | 36,918 | 64.0 | 58.3 | | |
| Quitman | 12,636 | 56.0 | 49.8 | | |
| Tunica | 9,652 | 73.0 | 67.1 | | |
| | 105,171 | 63.1 | 56.5 | 3.84–3.70 | 91 |
| **District 12** | | | | | |
| Forrest | 66,018 | 26.8 | 23.3 | | |
| Perry | 9,864 | 21.7 | 19.1 | | |
| | 75,882 | 26.1 | 22.8 | 4.08–4.19 | 6 |
| **District 13** | | | | | |
| Covington | 15,927 | 34.6 | 29.7 | | |
| Jasper | 17,265 | 49.2 | 43.9 | | |
| Simpson | 23,441 | 30.7 | 26.8 | | |
| Smith | 15,077 | 21.2 | 17.6 | | |
| | 71,710 | 34.0 | 29.6 | 0.0 | 15 |

| | Total Population | Black % | Black VAP | % Black Attorneys Eligible | No. of Black Elected Officials |
|---|---|---|---|---|---|
| District 14 | | | | | |
| Copiah | 26,503 | 48.4 | 43.3 | | |
| Lincoln | 30,174 | 30.0 | 26.3 | | |
| Pike | 36,173 | 43.3 | 38.3 | | |
| Walthall | 13,761 | 41.0 | 35.2 | | |
| | 106,611 | 40.5 | 35.7 | 4.04 | 23 |
| District 15 | | | | | |
| Jeff Davis | 13,846 | 53.6 | 48.2 | | |
| Lamar | 23,821 | 10.8 | 9.6 | | |
| Lawrence | 12,518 | 30.9 | 27.2 | | |
| Marion | 25,708 | 29.9 | 25.8 | | |
| Pearl River | 33,795 | 14.9 | 13.3 | | |
| | 109,688 | 24.2 | 21.3 | 0.0 | 20 |
| District 16 | | | | | |
| Clay | 21,082 | 50.0 | 45.1 | | |
| Lowndes | 57,304 | 34.2 | 29.6 | | |
| Noxubee | 13,212 | 64.6 | 59.1 | | |
| Oktibbeha | 36,018 | 34.3 | 28.8 | | |
| | 127,616 | 40.0 | 34.7 | 5.55–5.21 | 44 |
| District 17 | | | | | |
| DeSoto | 53,930 | 17.8 | 16.3 | | |
| Panola | 28,164 | 48.9 | 42.9 | | |
| Tallahatchie | 17,157 | 57.3 | 50.3 | | |
| Tate | 20,119 | 38.4 | 34.5 | | |
| Yalobusha | 13,183 | 38.2 | 32.8 | | |
| | 132,553 | 34.7 | 30.8 | 0.93 | 39 |
| District 18 | | | | | |
| Jones Co. | 61,912 | 23.1 | 20.6 | 1.19 | 7 |
| District 19 | | | | | |
| George | 15,297 | 9.5 | 8.1 | | |
| Greene | 9,827 | 20.1 | 17.2 | | |
| Jackson | 118,015 | 18.7 | 16.3 | | |
| | 143,139 | 17.8 | 15.5 | 3.16 | 13 |
| District 20 | | | | | |
| Madison | 41,613 | 55.9 | 50.3 | | |
| Rankin | 69,427 | 18.6 | 17.4 | | |
| | 111,040 | 32.6 | 29.5 | 4.76 | 18 |
| Hinds County | 250,998 | 45.1 | 40.2 | 3.84–3.39 | 25 |
| Harrison County | 157,665 | 19.28 | 16.86 | 1.32 | 5 |
| Jackson County | 118,015 | 18.74 | 16.26 | 3.49 | 9 |

*History of Official Discrimination*

13. Mississippi has a long history of official discrimination touching on the right of black citizens to vote and participate in the democratic process. This history has been judicially determined by federal courts at all levels. This Court took judicial notice of these determinations as set forth in the many cases listed in Exhibit P–128.

14. This history includes the use of such discriminatory devices as poll taxes, literacy tests, and intimidation of blacks. The history also includes the frequent use in municipal elections of at-large elections and majority-white election districts which had the effect of precluding black citizens from election to public office.

15. This history of discrimination has extended to the bar and consequently to the judiciary. In 1967 the first black student was graduated from the University of Mississippi School of Law, the only state supported law school and the only accredit-

ed law school in the state in 1967. That first graduate was Reuben Anderson, now a justice of the Mississippi Supreme Court. Before 1967 there were only a handful of black attorneys in the state. At present approximately 5% of the enrollment at each of the two law schools in the state are black students.

16. The first black judge in Mississippi since Reconstruction was Reuben Anderson who received a gubernatorial appointment to fill a vacant Hinds County Court seat in 1977. Thereafter Justice Anderson was appointed by the governor to a 7th Circuit Court vacancy. Justice Anderson was unopposed in his election to a full term in that position in 1982. Subsequently in 1985 he was appointed by the governor to a vacancy on the Mississippi Supreme Court and in 1986 was elected to a full term in that position. In 1978 Cleve McDowell was elected County Judge of Tunica County in an uncontested election. In 1985 Fred Banks was appointed by the governor to fill the vacancy on the 7th Circuit Court created by Justice Anderson's appointment to the Mississippi Supreme Court. These are the only three blacks to have served on the state bench in Mississippi, other than justice court judges. There are 111 state court judgeships: nine supreme court justices, 39 chancery judges, 40 circuit judges and 23 county court judges.

17. The bar of the State of Mississippi is an integrated bar (meaning that all practicing attorneys must be members). Membership of the Mississippi State Bar Association is approximately 5,900. Willie Rose, immediate past president of the Magnolia Bar Association, an association primarily of black attorneys, testified that there are approximately 220 black lawyers in the state of whom approximately 150 are statutorily qualified to run for chancery or circuit judge, or 2.5% of all lawyers. The population of the state is approximately 35% black.

*Racially Polarized Voting*

18. The existence of racially polarized voting in Mississippi has been found by numerous courts. Exhibit P–128.

19. Both sides called experts on racial bloc voting who had performed analyses using the recognized ecological regression and homogeneous precinct methods. Both experts had studied judicial elections and other elections. These analyses produced essentially the same results and conclusions as to the particular elections studied. The primary differences in their testimony resulted from the fact that Dr. Allan Lichtman, who testified for the plaintiffs, limited his study of judicial elections to the judicial elections in which there were races pitting blacks against whites whereas Dr. Harold Stanley, who testified for the defendants, included in his study all judicial elections since 1978.

20. Of the eight judicial elections involving black candidates studied by Dr. Lichtman, only one black candidate won. Of the unsuccessful black candidates, each carried the black vote by at least 59% (except for one to be explained later) with the average percentage of black vote for the black candidate being 68%. No black candidate who lost received more than 12% of the white vote with the average percentage of the white vote for the black candidate being 2%. The only black candidate receiving less than 59% of the black vote was Melvin Jennings who ran for Chancery Judge in the 5th Chancery Court District in 1982. He received only 30% of the black vote. Jennings was under federal indictment at the time of the election and was later convicted. If the Jennings election figures are omitted, Dr. Lichtman's analysis shows that on average 75% of black voters and only 1% of the white voters voted for the unsuccessful black candidates. *See* Exhibit P–10.

21. The only successful black judicial candidate in a contested election was Justice Reuben Anderson in the 1986 Democratic Primary for the Central District Supreme Court seat. Justice Anderson ran against Richard Barrett, an avowed segregationist. Justice Anderson received 85% of the black votes and 58% of the white votes. Dr. Lichtman and Dr. Stanley both attributed Justice Anderson's success to his qualifications and experience as compared to that of Barrett.

22. Dr. Lichtman also studied the 1984 and 1986 congressional election for the Sec-

ond Congressional District. This district is known as the Delta District and comprises basically the counties extending along the Mississippi River in the western segment of the state. It has a slight black majority voting age population. In 1984 Robert Clark, a black state senator running as a Democrat, challenged white Republican incumbent Webb Franklin. In 1986 Mike Espy, a black lawyer running as a Democrat challenged Franklin. Clark narrowly lost in 1984, receiving 95% of the black vote and 7% of the white vote. Espy narrowly won in 1986 receiving 97% of the black vote and 12% of the white vote.

23. Dr. Lichtman concluded that there is great polarization by both black and white voters throughout Mississippi but that polarization is particularly striking among whites who refuse to vote for black candidates. Dr. Lichtman characterizes the Anderson victory over Barrett as an aberration. He testified that although cross-over white votes elected Espy, the white vote was greatly polarized with the white candidate receiving 88% of the white vote.

24. Dr. Stanley studied 57 judicial elections rather than just the nine involving blacks against white. His analysis showed that in 37 of the 57 elections studied a majority of blacks voting voted for the winning candidate. From this and from Justice Anderson's victory he concluded that blacks and whites are not polarized in most judicial elections. He did concede that there is strong polarization of both races when elections involve blacks against whites.

25. Several witnesses who have been actively involved with politics on various levels in various parts of the state corroborated the conclusion of Dr. Lichtman that great polarization exists.

26. The Court finds that racial polarization of voters exists throughout the State of Mississippi, and specifically in those certain districts for which relief is granted hereunder, and that blacks overwhelmingly tend to vote for blacks and whites almost unanimously vote for whites in most black versus white elections.

*The Use of Unusually Large Election Districts, Majority Vote Requirements, Anti-Single Shot Provisions, and Other Voting Practices Which May Enhance the Opportunity for Discrimination*

27. Plaintiffs have argued that the districts for the chancery and circuit courts are unusually large and hinder the opportunity for blacks to elect candidates of their choice. Although black candidacies are generally less well financed than their white counterparts and black candidates must accordingly rely on door-to-door campaigning rather than the use of paid television advertisements, Mississippi is still a largely rural state, the use of television in judicial races is not widespread and the voters expect personal solicitation. There is valid policy for the limitation on the number of chancery and circuit court districts into which the state is divided. The size of the present chancery and circuit court districts does not discriminate against black candidates and therefore black voters.

28. Most chancery and circuit court districts are multi-judge districts and in some multi-judge districts judicial candidates run for specific posts. State election laws provide that a majority vote is required to win party nomination. In the general election the winner is determined by the candidate receiving a plurality of the votes. Because of this many black candidates have qualified and run as independents rather than as candidates of a particular political party. There are no anti-single-shot voting laws. Although it is obvious that abolition of the majority vote requirements and post system without adoption of anti-single-shot voting laws would make it easier in some situations for black candidates to be elected, this Court cannot hold that these provisions as they now exist discriminate against blacks per se.

*Candidate Slating Process*

29. There is no candidate slating process in Mississippi.

*Socio-Economic Disparities*

30. It is clear that throughout the State of Mississippi substantial socio-economic disparities exist between blacks and whites.

Blacks trail whites in years of education completed, per capita income and percentage of population falling below the poverty line (Exhibit P–16). Dr. Chandler Davidson, a sociologist presented by the plaintiffs, testified that studies show that persons having a lower socio-economic standing tend to register and vote at lesser rates than those who have a higher standing. He testified that blacks and whites of the same socio-economic standing tend to register and vote at approximately the same rates. Since blacks comprise only 35% of the population of the state and since a considerably higher percentage of blacks than whites are of lower socio-economic status, this socio-economic status of most blacks in Mississippi does hinder the ability of blacks to participate effectively in the political process.

### Racial Appeals During Political Campaigns

31. With the large registration of and participation of black voters in Mississippi elections, racial appeals by candidates are much less frequent than in past years. Plaintiffs, however, presented proof of racial appeals by white candidates in two recent elections: by Richard Barrett in his 1986 challenge of Mississippi Supreme Court Justice Reuben Anderson and by white Congressman Webb Franklin in his 1986 race against challenger Mike Espy. The racial appeals by Barrett were overt and contained no subtlety. The racial appeals by Franklin were more subtle. In both elections the black candidate won with cross-over white votes.

### Extent to Which Blacks Have Been Elected to Public Office

32. Since the passage of the Voting Rights Act of 1965 and other civil rights activities of the 1960's, participation by blacks throughout Mississippi in the electoral process has greatly increased resulting in over 500 blacks presently holding elected office in Mississippi (Exhibit D–52). With few exceptions, however, all of these black officials are elected from black majority, single-member election districts. Justice Reuben Anderson and Congress-man Mike Espy are the only two blacks who have been elected from districts with large geographical areas. Espy's district has a majority black population while Anderson's district has a majority white population. Testimony indicated only three blacks other than Anderson have been elected to public office from white majority districts: Bennie Turner, County Prosecuting Attorney for Clay County; the County Coroner for Clay County; and an Alderman from Corinth.

### Responsiveness

33. Plaintiffs have offered no evidence on the issue of lack of responsiveness on the part of elected officials, and particularly the elected judiciary of Mississippi, to the particularized needs of the members of the black community. However, several of the witnesses testified that perception of the justice system among blacks would be improved if there were more black judges.

### Tenuousness of the State Policy Underlying At-Large Judicial Districts

34. There is valid policy underlying the division of the state into a limited number of chancery and circuit court districts and in having multi-judge districts for court administration purposes (as opposed to election purposes) in those districts where caseloads require more than one judge. Although plaintiffs argue that the state has no such policy, the creation by the legislature of such districts is a direct adoption of such a policy by the state.

35. Although the state has adopted the policy of the post system of electing judges in multi-member judicial districts above the justice court level, it long ago adopted the policy of single-member electoral districts for justice court judges. The state also has the policy of judges deciding cases which may originate outside their election districts. Supreme Court justices are elected from one of three districts but hear cases statewide. Justice court judges are elected from districts but hear cases countywide. Thus, this Court concludes that the policy of post system elections in

multi-judge chancery, circuit and county court judicial districts is tenuous.

### Legislative Intent to Adopt or Maintain Judicial Electoral System

36. Plaintiffs introduced evidence in the form of old newspaper articles (Exhibits P–44, P–45 and P–122) which indicated a racial motive underlying the adoption of statutes instituting a system in the early 1900's for electing judges. Before that time judges had been appointed. Defendants' expert Dr. Westley Busbee, a professor of Mississippi history, testified, however, that the reference to the possible election of blacks, if judges were to be elected, was an opposition tactic used at the time by supporters of an appointed judiciary. After Reconstruction when whites were successful in disenfranchising blacks, the state was largely controlled by the landed aristocracy, known as the Bourbons, from the older, wealthier areas of the state which largely lay along the fertile lands bordering the Mississippi River. As the state grew, the poorer, hill lands in the eastern part of the state became more populous. During the early 1900's the progressive or populist movement became popular in the hill areas. The adoption of judicial elections was but one of the successful battles won by the progressives against the Bourbons. Thus, the issue of race was not a reason for the adoption of an elected judiciary.

37. Dr. Busbee studied the legislative passage of statutes adding chancery and circuit judges from 1968 through 1983 when most multi-member judicial districts were created and during which time there were blacks in the Mississippi Legislature. This study examined roll-call votes. The Mississippi Legislature keeps no formal legislative history of statutes. The study indicated practically no opposition by black senators or representatives to the adoption of any of the statutes. In 1985 the Legislature passed Chapter 502 of the Laws of 1985 recodifying all judicial districts and judgeships. Only two of sixteen black legislators voted against it. This Court concludes that neither a post system of judicial elections in multi-member judicial districts nor multi-member judicial districts themselves were adopted for or are maintained with the intention of depriving blacks of the right to elect judicial candidates of their choice.

### Findings as to Specific Districts

38. The findings above are applicable generally to all chancery, circuit and county court districts in the state. The plaintiffs in addition presented specific proof as to certain districts.

39. Of the twenty chancery court districts four have majority black populations, the 7th, the 9th, the 11th and the 17th. All are multi-judge districts except the 17th. The 17th Chancery Court District is a single-judge district.

40. Hinds County constitutes the 5th Chancery Court District which has four judges. Rankin County constitutes the 20th Chancery Court District which has one judge. These are the only one-county chancery court districts.

41. In regard to the 5th, 7th, 9th and 11th Chancery Court Districts, plaintiffs have proven by a preponderance of the evidence the following: (1) blacks constitute a sufficiently large and geographically compact group in each district so that single-member judicial districts can be designed which would have substantial black populations and voting age majorities; (2) blacks are politically cohesive; and (3) the white voters vote sufficiently as a bloc to enable them usually to defeat black candidates who oppose white candidates.

42. Other than counties contained within the 7th, 9th, 11th and 17th Chancery Court Districts, the only counties containing black majority populations are Kemper in the 6th Chancery Court District, Jefferson Davis in the 13th Chancery Court District, Clay and Noxubee in the 14th Chancery Court District, and Marshall in the 18th Chancery Court District. Even though these particular counties have black majority populations, all lie in districts which have over-all white majority populations. In none of these districts do blacks

constitute a sufficiently large and geographically compact group so that the district could be divided into two, single-member sub-districts of equal population one of which has a substantial black population and voting age majority. Plaintiffs presented no proof as to the feasibility of dividing any of these districts into sub-districts. Plaintiffs' witnesses Kirksey and Turner both admitted that the 14th Chancery District could not be divided into single-member sub-districts having equal populations with one of the sub-districts having a black majority population.

43. Of the twenty circuit court districts three have majority black populations, the 4th, the 6th and the 11th. The 4th and 11th Circuit Court Districts are multi-judge districts; the 6th is a single-judge district.

44. Jones County constitutes the 18th Circuit Court District which has one judge. The 18th is the only one-county circuit court district.

45. In regard to the 4th and 11th Circuit Court Districts, plaintiffs have proven by a preponderance of the evidence the following: (1) blacks constitute a sufficiently large and geographically compact group in each district so that single-member judicial districts can be designed which have substantial black populations and voting age majorities; (2) blacks are politically cohesive; and (3) the white voters vote sufficiently as a bloc to enable them usually to defeat black candidates who oppose white candidates.

46. Other than counties contained within the 4th, 6th and 11th Circuit Court Districts, the only counties containing black majority populations are Marshall in the 3rd Circuit Court District, Yazoo in the 7th Circuit Court District, Claiborne, Issaquena and Sharkey in the 9th Circuit Court District, Kemper in the 10th Circuit Court District, Jefferson Davis in the 15th Circuit Court District, Clay and Noxubee in the 16th Circuit Court District, Tallahatchie in the 17th Circuit Court District and Madison in the 20th Circuit Court District. Even though these particular counties have black majority populations, all lie in districts which have over-all white majority populations. In none of the 3rd, 10th, 15th, 16th, 17th and 20th Circuit Court Districts do blacks constitute a sufficiently large and geographically compact group so that the district could be divided into two, single-member sub-districts of equal population one of which has a substantial black population and voting age majority.

47. Hinds and Yazoo Counties constitute the 7th Circuit Court District which has four judges. Even though the 7th Circuit Court District has an over-all white majority population, plaintiffs have proven by a preponderance of the evidence the following: (1) blacks constitute a sufficiently large and geographically compact group in the district so that at least one single-member judicial district can be designed which would have a substantial black population and voting age majority; (2) blacks are politically cohesive in the district; and (3) the white voters vote sufficiently as a bloc to enable them usually to defeat black candidates who oppose white candidates. The Court makes these findings in spite of the fact that Justice Reuben Anderson was elected as a circuit judge in this district.

48. Claiborne, Issaquena, Sharkey and Warren Counties constitute the 9th Circuit Court District which has two judges. Even though Claiborne, Issaquena and Sharkey Counties all have substantial black population majorities, the district as a whole has a white population majority because of the larger population of Warren County and its smaller percentage of black population. Of the total population in the 9th Circuit Court District of 74,627, 22,756 of its citizens live in Claiborne, Issaquena and Sharkey Counties and 51,627 live in Warren County. Kirksey testified that he could design two single-member sub-districts with substantially equal populations from the 9th Circuit Court District, but, in order for one of those to have a substantial black population with a black majority voting age population, the black majority district would have to include all of Claiborne, Issaquena and Sharkey Counties plus almost all of Warren County, leaving as the second sub-district a portion of the City of Vicksburg. This design would be greatly

distorted, would divide the two judges of the district strongly along rural versus urban lines and would require that the candidate of preference for the black voters in the black majority sub-district run from a large four county area, a situation to which plaintiffs have objected by presentation of much evidence to the effect that geographically large districts hinder black candidates. Thus, the Court finds in regard to the 9th Circuit Court District that a single-member district cannot be designed which will give blacks any greater potential to elect a judicial candidate of their choice than the system which is now in effect in the District.

49. As in the case of the 14th Chancery Court District which also includes Clay and Noxubee Counties, plaintiffs' witnesses Kirksey and Turner both admitted that the 16th Circuit Court District could not be divided into single-member sub-districts having equal populations with one of the sub-districts having a black majority.

50. Madison and Rankin Counties constitute the 20th Circuit Court District which has two judges. Madison County has a black majority population equal to 55.9 percent of its 41,613 citizens. Rankin County has a total population of 69,427 of whom 18.6 percent are black. Accordingly, blacks do not constitute a sufficiently large and geographically compact group in the district so that two single-member sub-districts with substantially equal populations can be designed one of which would have a substantial black population and voting age majority.

51. Hinds County has a county court with three county judges. Although Hinds County has a black minority population of 45.1 percent, plaintiffs have proven by a preponderance of the evidence the following: (1) blacks constitute a sufficiently large and geographically compact group in Hinds County so that at least one single-member judicial district can be designed which will have a substantial black population and voting age majority; (2) blacks are politically cohesive; and (3) the white voters vote sufficiently as a bloc to enable them usually to defeat black candidates who oppose white candidates.

52. Harrison and Jackson Counties both have county courts with two judges. They have minority black populations of 19.28 percent and 18.74 percent respectively. Blacks do not constitute a sufficiently large and geographically compact group in either county so that a single-member judicial district can be designed which would have a substantial black population and voting age majority.

### Other Findings

53. The policy of Mississippi in regard to filling judicial offices, as expressed by legislative adoption of election statutes, includes a majority vote feature as to a part of the process. Although the winner of the general election is the candidate who receives a plurality, to obtain nomination as a candidate of the Democratic or Republican Party the candidate must receive a majority of the vote in the party primary. If no candidate receives a majority in the first primary, a run-off is held between the two candidates polling the most votes. Independents can qualify to run in the general election without participating in the party nominating process. Mississippi also has a policy of requiring judges in multi-member judicial districts to stand for election as to specific posts. This policy has also been expressed by the legislative passage of statutes. Plaintiffs offered no proof or argument attacking either of these policies. This Court finds that neither policy is a per se violation of Section 2 of the Voting Rights Act of 1965.

54. If deemed a proper remedy for any Section 2 violations, the division of any multi-member judicial districts into sub-districts for election purposes should be done so that the sub-districts so created contain substantially equal populations. This finding is not based on any ruling of this Court that the one-man, one-vote concept applies to judicial elections, which it does not, but on general principles of equity.

55. Willie Rose testified as to the number of black lawyers in various counties

who are statutorily qualified to hold the office of chancery, circuit or county judge. The following is a listing by district and county of those persons.

### Statutorily Qualified Black Lawyers

| Chancery Court Districts | | | |
|---|---|---|---|
| 5th | Hinds | 52 | |
| 7th | Bolivar | 4 | |
| | Coahoma | 0 | |
| | Leflore | 4 | |
| | Quitman | 0 | |
| | Tallahatchie | 0 | |
| | Tunica | 0 | |
| | | | 8 |
| 9th | Humphreys | 0 | |
| | Issaquena | 0 | |
| | Sharkey | 0 | |
| | Sunflower | 2 | |
| | Warren | 8 | |
| | Washington | 14 | |
| | | | 24 |
| 11th | Holmes | 2 | |
| | Leake | 1 | |
| | Madison | 3 | |
| | Yazoo | 0 | |
| | | | 6 |

| Circuit Court Districts | | | |
|---|---|---|---|
| 4th | Humphreys | 0 | |
| | Holmes | 2 | |
| | Leflore | 4 | |
| | Sunflower | 2 | |
| | Washington | 14 | |
| | | | 22 |
| 7th | Hinds | 52 | |
| | Yazoo | 0 | |
| | | | 52 |
| 11th | Bolivar | 4 | |
| | Coahoma | 0 | |
| | Quitman | 0 | |
| | Tunica | 0 | |
| | | | 4 |

The proof showed that of these statutorily qualified black lawyers a number are engaged in other public activities, such as being members of the state legislature, from which they would have to resign in order to be eligible to hold a judgeship.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and subject matter of the action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 42 U.S.C. §§ 1973, 1973a(c), 1973j(f).

2. The action has been properly certified as two class actions under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

3. Plaintiffs challenge the at-large, numbered post election method and use of multi-member districts for judicial elections under the Fourteenth and Fifteenth Amendments to the Constitution. Multi-member districts and at-large plans are not per se illegal under the Equal Protection Clause. *Whitcomb v. Chavis*, 403 U.S. 124, 142, 91 S.Ct. 1858, 1868, 29 L.Ed.2d 363 (1971); *Seastrunk v. Burns*, 772 F.2d 143, 150 (5th Cir.1985). Multi-member districts violate the Fourteenth Amendment only if "conceived or operated as purposeful devices to further racial discrimination." *Rogers v. Lodge*, 458 U.S. 613, 617, 619, 102 S.Ct. 3272, 3275, 3276, 73 L.Ed.2d 1012 (1982); *Whitcomb*, 403 U.S. at 149, 91 S.Ct. at 1872. There was no purposeful discrimination and no intent to discriminate when the statutes creating, adding to, and maintaining (recodifying) the multi-member judicial districts and the post system of judicial elections were enacted. Therefore, plaintiffs' Constitutional challenge fails.

4. All portions of Mississippi are covered under Section 4(a) of the Voting Rights Act for which preclearance is required under Section 5 of the Act, 42 U.S.C. § 1973c. Since the filing of these cases,

Defendants have obtained Section 5 preclearance from the United States Attorney General of all judicial election statutes challenged by Plaintiffs, except for the post provisions in the multi-member judicial districts. Contrary to defendants' argument, Section 5 preclearance does not preclude plaintiffs from challenging those statutes under Section 2. Although this point was raised by the parties in *Thornburg v. Gingles,* 478 U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the issue was not discussed by the United States Supreme Court. This Court accepts as proper the reasoning of Judge Phillips in *Gingles v. Edmisten,* 590 F.Supp. 345, 375–76 (E.D.N.C.1984), *aff'd. in part and rev'd in part sub nom Thornburg v. Gingles,* 478 U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), which held that Section 5 pre-clearance does not preclude plaintiffs' Section 2 challenge. The standards by which the United States Attorney General assesses voting changes under Section 5 are different from those by which judicial claims under Section 2 are to be assessed by the judiciary. 590 F.Supp. at 376, *citing* S.Rep. 97–417 No. 10, at 68, 138–39. Also, because the standards for Section 5 preclearance were applied in a non-adversarial administrative proceeding, the Attorney General's preclearance determination has no issue preclusive effect to this action and private plaintiffs can challenge a plan or procedure even after Section 5 preclearance. 590 F.Supp. at 376; *see also U.S. v. East Baton Rouge Parish School Board,* 594 F.2d 56, 59–60 & n. 9 (5th Cir.1979); *Cook v. Luckett,* 575 F.Supp. 485, 491 n. 1 (S.D.Miss. 1983).

 5. Defendants assert that Section 2 of the Voting Rights Act does not apply to the election of state court judges. Defendants base their argument on the inclusion of the word "representatives" in the language of the statute. Section 2(b), as amended in 1982, provides that a violation of Sub-section 2(a) is established if, based on the totality of the circumstances, it is shown that members of a minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of

their choice." 42 U.S.C. § 1973(b). There is no legislative history of the Voting Rights Act or any racial vote dilution case law which distinguishes state judicial elections from any other types of elections. Judges do not "represent" those who elect them in the same context as legislators represent their constituents. The use of the word "representatives" in Section 2 is not restricted to legislative representatives but denotes anyone selected or chosen by popular election from among a field of candidates to fill an office, including judges. Mississippi has chosen to hold elections to fill its state court judicial offices; therefore, it must abide by the Voting Rights Act in conducting its judicial elections, including Section 2 of the Voting Rights Act. Accordingly, this Court concludes as a matter of law that Section 2 applies to judicial elections.

The defendants also argue that since the one-person, one-vote doctrine does not apply to judicial elections, then by analogy Section 2 of the Voting Rights Act does not apply. This argument simply is not persuasive.

6. Congress substantially revised Section 2 of the Voting Rights Act in 1982 to make clear that a violation could be proven by showing a discriminatory result or effect alone without proof of a discriminatory purpose. Section 2 as amended provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this

section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

7. *Thornburg v. Gingles,* 478 U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), is the latest case interpreting Section 2 as amended in 1982, and the Court accepts that case as applying to the issues before it. The analysis and ruling of *Thornburg* must be applied district by district. "The inquiry into the existence of vote dilution caused by submergence in a multi-member district is district-specific." *Thornburg,* 478 U.S. at —— n. 28, 106 S.Ct. at 2771 n. 28, 92 L.Ed.2d at 52 n. 28.

8. The Senate Judiciary Committee Majority Report accompanying the bill that amended Section 2 in 1982 noted typical factors or circumstances that might be probative of a Section 2 violation. These factors were also set forth in *Thornburg.*

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of a minority group in a state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thornburg,* 478 U.S. at ——, ——, 106 S.Ct. at 2759, 2762, 92 L.Ed.2d at 38, 42; S.Rep. 28–29. The Senate Report also mentioned additional factors that in some cases would have probative value to establish a violation. These are:

A. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

B. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.,* 478 U.S. at ——, 106 S.Ct. at 2759, 92 L.Ed.2d at 38; S.Rep. 28–29.

9. The Senate Report stressed that the list of tentative factors was not comprehensive or exclusive. As the Court in *Thornburg* found, "While the enumerated factors will often be pertinent to certain types of Section 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." At ——, 106 S.Ct. at 2763, 92 L.Ed.2d at 43; S.Rep. 29–30. The Senate Committee Report also stated that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.,* at ——, 106 S.Ct. at 2763, 92 L.Ed.2d at 43; S.Rep. 29. The question whether the political processes are "equally open" depends upon a searching practical evaluation of the "past and present reality" and on a "functional"

view of the political process. At ——, 106 S.Ct. at 2764, 92 L.Ed.2d at 43; S.Rep. 29–30.

10. Sub-section 2(b) establishes that Section 2 of the Voting Rights Act has been violated where the "totality of the circumstances" reveal that "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... and that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b); *Thornburg,* at ——, 106 S.Ct. at 2763, 92 L.Ed.2d at 42. This Court has analyzed the totality of the circumstances presented in this case and concludes that there is a violation of Section 2 in the 5th, 7th, 9th, and 11th Chancery Court Districts, in the 4th, 7th, and 11th Circuit Court Districts and in the Hinds County Court District (hereinafter referred to as "specified districts").

11. The Court finds the proof submitted by plaintiffs is sufficient to establish a past history of official discrimination on a statewide basis including the specified districts. This discrimination has in the past affected the right of blacks to register, to vote, or otherwise to participate in the democratic process.

12. Racial bloc voting is a key element of a vote dilution or vote discrimination claim under Section 2. Section 2 does not assume the presence of racial bloc voting; plaintiffs must prove it. *Thornburg,* at ——, 106 S.Ct. at 2764, 92 L.Ed.2d at 44. Plaintiffs have proved a pattern of racial bloc voting statewide but also specifically in certain districts, namely the 5th, 7th, 9th, 11th, and 14th Chancery Court Districts, the 4th, 7th, 11th and 16th Circuit Court Districts, and Hinds County Court District.

Although the Court in *Thornburg* recognized that the degree of racial bloc voting that is cognizable as an element of a Section 2 vote dilution claim will vary from district to district according to a variety of factual circumstances, the Court did announce general principles for legally significant racial bloc voting. The purpose of examining the existence of racially polarized voting is two-fold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. *Thornburg,* at ——, 106 S.Ct. at 2796, 92 L.Ed.2d at 50. In general, a white bloc vote that normally will defeat the combined strength of minority support plus white "cross-over" votes rises to the level of legally significant white bloc voting. *Id.* A showing that a significant number of minority group members usually vote for the same candidates also amounts to racial bloc voting. *Id.*

Although it varies from district to district, the evidence in this case establishes legally significant racial bloc voting. Based on the evidence presented, this Court concludes that the State of Mississippi, and especially the specified districts, experience racially polarized voting which rises to the level of legal significance under Section 2 of the Voting Rights Act.

13. As to the consideration that any "unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices" may enhance the opportunity for discrimination, this Court has found that the judicial districts are not unusually large for their purpose of equalizing case loads and that there is a valid policy for the limitation on the number of districts into which the State is divided. The state does not have anti-single-shot voting laws. The majority vote requirement is not a strongly probative factor since evidence has shown that many black candidates choose to run as independents rather than as party candidates and there is no majority vote requirement in the general election. Furthermore, majority vote requirements and a post system are not per se discriminatory provisions.

14. A "slating process" is not a relative factor in this case because no proof was presented of any type of candidate slating process.

15. The proof established that minority members still bear the effects of past dis-

crimination. There was substantial proof of socio-economic disparities between black and white citizens of Mississippi. This disparity at times hinders the minority's ability to participate effectively in the political process.

16. Although the proof established one or two extreme cases of racial appeals in political campaigns, the Court did not find this to be pervasive throughout all districts. Therefore, this factor is not probative in this action.

17. Members of the minority group have been elected to many public offices as shown in the Table under Findings of Fact Paragraph 12 and Exhibit P–52, yet none have been elected to the judgeships in question here in the twentieth century. Those blacks who have served as state court judges have done so through appointment and election as incumbents.

18. There is no significant lack of responsiveness on the part of the elected judiciary of Mississippi.

19. This Court has determined that the policy of post system elections in multi-judge chancery, circuit and county court judicial districts is tenuous.

20. Though most of these factors apply to all judicial districts statewide, the Court examines the totality of the circumstances to find other factors dealing with the "functional" view of the political process.

 a. Blacks constitute 35% of the population of Mississippi, but constitute only 3.7% of the lawyers in Mississippi: 220 of the 5,900 lawyers in Mississippi are black. Only approximately 150 of the black lawyers in the state have the statutory requirements to be elected as a judge, amounting to 2.5% of all lawyers. This is not a controlling factor, but a factor the Court has noted.

 b. Testimony by witnesses established that plaintiffs would like to see at least 10% to 30% of the judicial positions filled by blacks. Section 2(b) clearly provides, "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). Section 2 does not grant a right to proportional representation; it merely permits equality of opportunity for participation. In many districts there are few statutorily qualified black lawyers who may seek to run for judicial election.

21. A factor concerning the "functional" view of the political process which this Court finds most relevant is the composition of blacks in the challenged districts. The concentration of the black population in only a few areas by which the minority group could constitute a sufficiently large and geographically compact group in each district so that single-member districts can be designed which would have substantial black populations and voting age majorities is an important factor to this Court. *Thornburg* established:

> Multimember districts and at-large election schemes, however, are not per se violative of minority voters' rights.... Minority voters who contend that the multimember form of districting violates § 2 must prove that the use of a multi-member electoral structure operates to minimize or cancel out their ability to elect their preferred candidates. *See, e.g.*, S.Rep. 16.
>
> *While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice....* These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates.... Sec-

ond, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Thornburg,* at ———-———, 106 S.Ct. at 2765–2767, 92 L.Ed.2d at 45–47 (citations omitted) (emphasis added).

Although evidence has established that throughout the state the minority group is politically cohesive and the white majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate, only in a few districts have the plaintiffs established that the minority group is sufficiently large and geographically compact in the district to constitute a majority in a single-member district. Many factors enumerated in the Senate Judiciary Committee Report are present in all districts, yet only in the 5th, 7th, 9th and 11th Chancery Court Districts, in the 4th, 7th, and 11th Circuit Court Districts, and in Hinds County Court District, are these factors present *in conjunction with the circumstances* of a sufficiently large and geographically compact minority group, political cohesiveness of the minority group, and a white majority which votes as a block to defeat the minority's preferred candidate. *See Thornburg,* at ———-———, 106 S.Ct. at 2766–2767, 92 L.Ed.2d at 46–47. In these specified districts only have the plaintiffs established by a preponderance of the evidence a violation of Section 2 of the Voting Rights Act by which blacks have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." In none of the remaining districts do blacks constitute a sufficiently large and geographically compact group so that the district could be divided into single-member sub-districts of substantially equal population one of which would have a substantial black population and black voting age majority. In those remaining districts the plaintiffs have failed to prove by a preponderance of the evidence that multimember districts and at-large election schemes violate their rights under Section 2 of the Voting Rights Act.

22. Plaintiffs have argued in regard to those districts in which black majority single-member sub-districts cannot be drawn that this Court should design single-member districts to raise the black voter percentage by concentrating blacks as much as possible in order to better "influence" the outcome of the elections. The Supreme Court in *Thornburg* has announced:

The reason that a minority group making such a challenge [a Section 2 challenge against the multi-member form of the district] must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.

*Thornburg,* at ——— n. 17, 106 S.Ct. at 2766 n. 17, 92 L.Ed.2d at 46 n. 17. The Plaintiffs have presented no legal argument to support their challenge to the contrary of *Thornburg,* and the Court concludes that it is not well-taken.

## CONCLUSION

▮▮ Even though many factors apply to all judicial districts in Mississippi, under the totality of the circumstances the overriding factor which applies to only a few districts is the existence of a sufficiently large and geographically compact minority group which can constitute a majority in a single-member district. This Court concludes, therefore, the judicial districts in which the plaintiffs have established a Section 2 violation on the basis that minority group members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice are the 5th, 7th, 9th, and 11th Chancery Court Districts, the 4th, 7th, and 11th Circuit Court Districts and Hinds County Court District. The plaintiffs are entitled to appropriate

relief from the violation in these specified districts. The Court further concludes that in spite of the findings of racial bloc voting and other factors regarding the remaining districts, especially the 14th Chancery Court District, the 9th and 16th Circuit Court Districts, and Harrison and Jackson County, there is no Section 2 violation as to those districts because blacks are not in such concentrations to constitute a sufficiently large and geographically compact group for which single-member districts of substantially equal population may be drawn.

In accordance with these Findings of Fact and Conclusions of Law, the Court will proceed to hold a hearing on the proper remedies to be implemented to correct the Section 2 violations regarding judicial elections in the 5th, 7th, 9th and 11th Chancery Court Districts, the 4th, 7th, and 11th Circuit Court Districts, and Hinds County Court District. The parties are instructed to develop alternative remedy plans for submission to this Court. The discussion of single-member districts in these Findings of Fact and Conclusions of Law does not preclude other remedies.

The parties are ordered to attend a Scheduling Conference on Friday, April 24, 1987, at 10:00 A.M. in Chambers to assist the Court in reaching a schedule for presentation of alternative remedies.