Floydist James MARTIN, et al., Plaintiffs,

v.

Ray MABUS *, Governor of Mississippi, et al., Defendants.

Henry KIRKSEY, et al., on Behalf of Themselves and all Others Similarly Situated, Plaintiffs,

v.

Ray MABUS *, Governor of Mississippi, et al., Defendants.

Civ. A. Nos. J84–0708(B), J85–0960(B).

United States District Court, S.D. Mississippi, Jackson Division.

Sept. 12, 1988.

Order Clarifying Opinion Oct. 11, 1988.

---

* The present governor of Mississippi, Ray Mabus, has been substituted as a party Defendant in place of his predecessor William A. Allain in accordance with Rule 25(b) of the Federal Rules of Civil Procedure.

Ellis Turnage, Cleveland, Miss., Robert B. McDuff, Lawyers' Committee for Civil Rights, Samuel Issacharoff, Washington, D.C., Johnnie L. Walls, Jr., Greenville, Miss., Julius L. Chambers, Pamela S. Karlan, NAACP Legal Defense & Educ. Fund, Inc., New York City, Carroll Rhodes, Hazlehurst, Miss., Lynda C. Robinson, Jackson, Miss., for plaintiffs.

John L. Maxey, Jackson, Miss., Landman Teller, Jr., Vicksburg, Miss., Stephen J. Kirchmayr, Asst. Atty. Gen., James Craig, Jackson, Miss., Stephen L. Thomas, Greenville, Miss., Charles H. Evans, Hubbard T. Saunders, IV, Jackson, Miss., Wiley J. Barbour, Yazoo City, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

BARBOUR, District Judge.

### I. BACKGROUND

This action is a Voting Rights Act claim by which the Plaintiffs challenged the system of electing circuit, chancery, and some county court judges in the State of Mississippi. The Plaintiffs alleged that the multi-member at-large system of electing judges in Mississippi diluted black voting strength and violated Section 2 of the Voting Rights

Act of 1965, 42 U.S.C. § 1973. The Court, on May 28, 1986, enjoined all elections of state court judges pending resolution of this issue. The Court ordered bifurcation of the liability and remedy phases. After a trial on liability in March of 1987, this Court found a violation of Section 2 of the Voting Rights Act in certain Mississippi judicial districts. *See Martin v. Allain*, 658 F.Supp. 1183, 1204 (S.D.Miss.1987) (Section 2 violation in judicial districts for Fifth, Seventh, Ninth and Eleventh Chancery Court Districts, Fourth, Seventh and Eleventh Circuit Court Districts, and Hinds County Court District). At the initial hearing on remedies on July 7, 1987, the Plaintiffs were the only party to propose plans and alternatives for the judicial districts found in violation of Section 2. The Plaintiffs presented plans drafted by Plaintiff Henry Kirksey for single-member sub-districts which did not change the boundaries of the existing judicial districts. The State presented no plan, but it did present expert testimony specifically criticizing the Plaintiffs' proposed plans. The State's expert illustrated that an emphasis on other factors would yield various other ways to draw sub-district lines with widely varying results.

The Court has found that the Plaintiffs' initial proposals by Henry Kirksey for sub-district lines are not acceptable because:

(a) The Plaintiffs' plans over-emphasized black voting strength and provided for proportional representation of Blacks. The plans sought to establish super-majority districts rather than districts giving Blacks the equal opportunity to participate in the political process and to elect representatives of their choice as provided in Section 2(b) of the Voting Rights Act, 42 U.S.C. § 1973(b);

(b) As pointed out by the State's expert, there were errors in the Plaintiffs' precinct lines because the Plaintiffs used legislative precinct lines as they existed in 1981, rather than precinct lines as they currently exist;

(c) The plans did not meet certain criteria which will be required by the Court, including preservation of whole counties where possible, not dividing towns and cities any more than necessary, and stability of lines, all of which will be more fully set forth later in this Opinion; and

(d) The sub-districts as drawn by the Plaintiffs would racially politicize the voters along racial lines. This would not promote the best interest of all citizens, including minority citizens, to have an unbiased judiciary.

 In the July 7, 1987, hearing, the State suggested that this Court should retain the at-large, multi-member districts but eliminate the post requirements. The Court has considered this suggestion and rejected it for several reasons. There has never been a redistricting plan approved which retains multi-member districts while doing away with post requirements. Although elimination of the posts would promote single-shot voting, single-shot voting is not a remedy for a Section 2 violation of unequal opportunity to elect candidates of the minority's choice; it is only a non-violating provision under certain circumstances. In order to achieve maximum effectiveness with single-shot voting in at-large districts, Blacks would have to forego casting other ballots. The end result would not necessarily do away with the Section 2 violation. Furthermore, Mississippi has a majority vote requirement in party primaries, *see Miss.Code Ann.* § 23–15–305 (Supp.1987), which is applicable to judicial elections. *Miss.Code Ann.* § 23–15–1013 (Supp.1987). Implementation by the Court of an election procedure using the at-large, multi-member districts without post requirements, as advocated by the State, would conflict with this majority requirement. The Court should try to conform as much as possible to the policies of the State of Mississippi as set forth in existing state election and political laws. For these reasons the Court has rejected the State's recommendation in the initial remedy hearing to eliminate the post system while retaining at-large multi-member districts in the enumerated judicial districts.

After the Court rejected the Plaintiffs' proposed plans, the Court was left with no plan to remedy the Section 2 violation.

Thereafter, the Court under Federal Rule of Evidence 706(a) appointed William J. Little, Jr. as an expert for the purpose of aiding the Court in drawing proposed sub-districts for election purposes of the districts found to be in violation of Section 2. After conferring with the expert, the Court was advised that the evidence presented in the remedy phase did not provide the expert with sufficient data with which to draw sub-district plans. The Court asked the parties to provide the needed demographic data for certain counties, but indicated that information was not needed for other counties since it was unlikely they would be divided due to location or population. *See* Order of September ´24, 1987. The parties agreed to stipulate as to the population data per precinct and to current precinct lines in the affected judicial districts. After receipt of the stipulated data and exhibits on December 4, 1987, the Court desired to give the expert some guidelines or direction in formulating the plans. Although the expert was familiar with and experienced in applying the established criteria for the redistricting of legislative election districts, the Court has found in this first case involving the redistricting of judicial districts that the nature of the judicial office is different from the nature of the legislative office and that modifications of existing redistricting criteria are required. The Court considered the evidence and arguments asserted in the liability and remedy phases, and the Court wrote a partial draft opinion which contained certain criteria for remedying the Section 2 violation in the enumerated judicial districts. The Court developed these criteria in an attempt to provide objective criteria and factors by which to draw redistricting plans. The Court directed the court-appointed expert to apply these criteria from the draft opinion in the formulation of his plans.

The expert submitted his plans for the districts to the Court. Pursuant to the policy of Federal Rule of Evidence 706(a), the Court provided copies of the expert's plans to the parties and inquired whether either party wished to depose the expert. The Court took the unusual step of filing the proposed plans and draft opinion not as an opinion, but as exhibits for establishing a foundation for examining the expert or objecting to the court-ordered plans. *See* Order of January 15, 1988. The parties notified the Court that a deposition of the expert Little was desired.

Thereafter, the parties filed objections to the court-appointed expert's plans, and a hearing was scheduled for July 11, 1988. The Court agreed to reopen the proof on the remedy phase to allow the Plaintiffs to propose alternative plans for subdivision of the judicial districts. The Plaintiffs also proposed a new system of "limited voting" in the multi-member districts rather than single-member sub-districts. As a natural result of allowing the parties to comment on the Court's proposed plans, certain criticisms were made of both the proposed plans and of the Court's draft opinion and certain changes have been made by the Court.

After having heard the evidence, proposed plans, and arguments, the Court hereby renders its decision.

## II. CRITERIA

This is a case of first impression regarding a remedy for a Section 2 violation involving judicial districts. The Court takes note of the Senate Judiciary Committee Majority Report accompanying the 1982 Amendments to the Voting Rights Act which recognizes

> [t]he basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated.... The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

Senate Report at 31 (footnote omitted); *see also Ketchum v. Byrne,* 740 F.2d 1398, 1412 (7th Cir.1984).

The basic tenets in remedying violations for legislative districts as set forth in the body of case law are applicable to this

case, but the Court finds that there are additional considerations in judicial cases that require greater emphasis on some factors. It is clear that the one-man one-vote doctrine is not applicable to judicial districts as it is to legislative districts, *Wells v. Edwards*, 347 F.Supp. 453, 454–55 (M.D.La.1972) (three-judge court), *aff'd mem.*, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973); *Voter Information Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 211 (5th Cir.1980); therefore, the Court is not strictly bound by the doctrine of de minimis variances in population. The Court finds, however, that general equity requires that population variance should be minimized between sub-districts. Since the one-man one-vote doctrine is not applicable to judicial redistricting, compensation for minor population shifts will not need to be made on a regular basis as for county supervisor districts, city wards, and state legislative districts. Accordingly, the most permanent boundaries possible should be selected for the judicial sub-districts.

The Court will use the traditional factors of contiguity, compactness, community of interest, natural boundaries, and preservation of existing precinct lines. Communities of interest differ somewhat in judicial elections than in legislative elections. Severe ethical restrictions are placed on an attorney's capabilities in campaigning for judicial office, and naturally lawyers are better known by their association with their home communities and home counties rather than with the district as a whole. The community of interest in electing a judicial candidate will therefore focus on whole communities or counties, thus the Court is hesitant to split towns and counties.

In judicial contests there is a different pool from which to draw candidates than in legislative elections. Judicial candidates have the additional requirements of being over the age of 30 and having been a practicing attorney for at least five years. *See* Mississippi Constitution § 150. This reduces the pool of candidates which may run.

The Court notes that in other cases calling for redistricting due to Section 2 violations plans try to approximate existing boundaries of sub-districts. In this case there are no sub-district boundaries. The Court instead will endeavor to use division lines with which voters are familiar, *i.e.,* county lines, precinct lines, supervisor district lines and major thoroughfares.

The Court believes that incumbency and experience is of greater value in judicial candidates than in legislative candidates. Once sub-district boundaries are established, the Court believes, based on the past history of re-election of sitting judges, that voters will recognize the value of experience gained while serving on the bench and will favor future incumbencies. The Court, however, has refrained from intentionally favoring any presently sitting judge and has received no evidence as to the residence of any presently sitting judge.

■ Sub-districts for election purposes with judges having district-wide jurisdiction is already implemented for all justice court districts and supreme court districts. *See* Mississippi Constitution § 171 (Justice Court Districts); *Miss. Code Ann.* § 23–15–991 to –997 (Supreme Court Districts). The Court therefore finds that having single-member sub-districts for election purposes within the subject chancery, circuit, and county court districts is the most plausible remedy for the Section 2 violation. Judges will be elected from the single-member sub-districts but will serve their judicial districts as a whole. The Plaintiffs' alternative remedy of limited voting will be discussed in Section III of this Opinion.

■ The Court finds that there should be a district residency requirement for candidates but not a sub-district residency requirement. Residency is appropriate for legislators who should be close to their constituents, but this is not equally true for judicial officers. The winning judicial candidates will not be serving their sub-districts, they will serve the whole district, and they will be applying the law in an unbiased manner rather than representing

their supporter; therefore, the successful candidates should not be swayed by political views of their "constituency" as is desirable among legislative candidates. The Court notes that seven existing chancery and circuit judicial districts in Mississippi have post residency requirements but the remaining thirty-three do not. Eliminating any sub-district residency requirements is not contrary to the policy on residency in this state. Furthermore, this ruling is necessitated by the low number of, and perhaps the lack of, statutorily qualified candidates for judicial office in some sub-districts. The Court therefore believes the most reasonable choice for the good of the people of the state without doing harm to the minority's interests is to eliminate any sub-district residency requirement and have a residency requirement only in the judicial district as a whole.

In balancing the similarities and differences between judicial elections and legislative elections, the Court has evaluated the evidence and has found the following considerations are the most important factors in drawing a plan for remedying Section 2 violations in the specified judicial districts. These factors for judicial redistricting should be considered in descending order of importance:

■ (1) In each district there should be at least one judicial sub-district with a black majority population of 60%. The Court uses the normal population figures since there have been no statistics for voting age population in each district presented to the Court.

A guideline of 65% of total population has been adopted and maintained for years by the Department of Justice and by some reapportionment experts and has been specifically approved by the Supreme Court in certain circumstances as representing the proportion of minority population reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice. *See Ketchum,* 740 F.2d at 1415. In the past courts have used a 5% corrective factor to correct the discrepancy between black total population and black voting age population, and have enhanced the majority figure by an additional 5% for low voter registration and an additional 5% for low voter turnout among minorities in certain districts. The Court is reluctant to automatically grant a 10% increase based on voter registration and voter turnout since there recently have been increased registration among black voters in the judicial districts and Blacks have enjoyed greater election success in districts with Black majorities of less than 65%. The Court finds that a black majority composition of 58–60% remedied the Section 2 violation in a redistricting of the Second Congressional District which basically covers the same geographical area as the enumerated judicial districts, as demonstrated by the election in 1986 of Congressman Mike Espy, a Black. The evidence also shows that there are presently black elected officials, other than Congressman Espy, presently holding office within the judicial districts involved in this lawsuit who were elected from districts with less than 65% black majorities.[1] A percentage majority

| Name | Position | Black Pop. % |
| --- | --- | --- |
| Reuben V. Anderson | Justice, 1st Supreme Court District, Mississippi Supreme Court | 45.36% |
| Claudine Brown | Tax Assessor and Collector, Leflore County | 59.13% |
| George Flaggs, Jr. | State Representative House District No. 55, Part of Warren County | 63.69% |
| Clayton P. Henderson | State Representative, House District No. 9 Tunica County and parts of DeSoto and Quitman Counties | 63.98% |
| Jimmy Holman | Mayor, City of Marks, Quitman County | 61.64% |

greatly higher than 65% should be avoided because the packing of all minority voters into one sub-district would leave them without influence in other sub-districts and would further racially politicize these judicial elections.

(2) The single member sub-districts must be contiguous and should be as compact as possible. As this Court held during the liability stage:

> The concentration of the black population in only a few areas by which the minority group could constitute a sufficiently large and geographically compact group in each district so that single-member districts can be designed which would have substantial black populations and voting age majorities is an important factor to this Court.... [O]nly in a few districts have the plaintiffs established that the minority group is sufficiently large and geographically compact in the

district to constitute a majority in a single-member district.

*Martin,* 658 F.Supp. at 1203–04. The Court found in the liability stage that where black voters were not compact, then a single-member district could not be designed which would give Blacks any greater potential to elect a judicial candidate of their choice than they already had. *See Martin,* 658 F.Supp. at 1197–98. Compactness will also aid in achieving stability.

■ (3) In multi-county districts, whole counties should be preserved where possible. Many counties follow natural boundaries with which voters are familiar, and maintaining county identities will promote a better knowledge of the legal abilities and reputations of the candidates among the electorate and reduce voter confusion.

(4) Where possible, cities or towns, with the exception of Jackson, Mississippi, should not be divided among separate sub-

| Name | Position | Black Pop. % |
| --- | --- | --- |
| Laverne Moore Holmes | Justice Court Judge, District A Red, Washington County | 63.4% |
| Sarah H. Johnson | Councilmember at-large, City of Greenville, Washington County | 59.83% |
| Herman Leach | Supervisor, District 3, Yazoo County | 62.4% |
| Leroy C. Parker | Alderman, City of Leland, Washington County | 59.89% |
| Rosie Simmons | Circuit Clerk, Bolivar County | 62.15% |
| Roosevelt Stapleton | Alderman, Town of Inverness, Sunflower County | 49.13% |
| Andrew Thompson, Jr. | Sheriff, Coahoma County | 64.01% |
| James Turner | Constable, Supervisor District 3, Washington County | 56.4% |
| Robert W. Walker | Mayor, City of Vicksburg, Warren County | 52.41% |
| Shadrick A. Wright | County Superintendent of Education, Quitman County | 55.98% |
| Bernadine S. Young | Justice Court Judge, District B Green, Washington County | 54.2% |

The evidence also showed two other black officials elected from districts with less than 65% black population which districts were outside of the geographical area encompassed by this lawsuit as follows:

| | | |
| --- | --- | --- |
| David Green | State Representative Amite, Pike & Wilkinson Counties | 60.4% |
| Alfred L. Walker, Jr. | State Representative, House District No. 55 | 50.6% |

districts. This likewise will promote a better knowledge of the legal abilities and reputations of the candidates among the electorate and reduce voter confusion.

■ (5) Where counties have to be divided, the sub-districts should be drawn along current precinct lines. These current precinct lines are the most permanent lines for election purposes and will have the most stability, although they may be changed slightly after the 1990 census. The Plaintiffs initially used the 1981 legislative precinct lines as were utilized after the 1980 census, but these lines have become outdated due to redistricting and population shifts in many counties. Many of these lines will be changed after the 1990 census.

■ (6) Precincts should not be divided among separate judicial sub-districts. Division of precincts only adds to voter confusion and provides administrative problems to election officials.

■ (7) If a county or a city has to be divided, wherever possible common lines should be used for both circuit and chancery court sub-district boundary lines. Likewise, in dividing Hinds County the plan should have as many common lines for circuit court, chancery court, and county court sub-districts as possible.

■ (8) A 15% maximum range of deviation is allowable for a population variance among sub-districts within a judicial district. Although the de minimis doctrine is not applicable, this Court believes that a general equality in population among the single-member sub-districts within a judicial district will be best for judicial administrative purposes.

### III. PARTIES' CRITICISMS AND ALTERNATIVES

The court-appointed expert, William Little, formulated his plans to conform with these criteria. In the reopened remedy hearing on July 11, 1988, the Court heard evidence of Little's Plans and other plans proposed by Plaintiffs' witnesses, Dr. William O'Hare and Henry Kirksey.

The main objection by the Plaintiffs to Little's Plans was to the numerical percentages of the black majority in certain sub-districts. The evidence presented by Plaintiffs at the hearing basically concerned an effort to obtain greater majorities in black majority sub-districts. The Plaintiffs attacked the Court's finding in the draft opinion that there has been increased registration among Blacks and the criterion based in part thereon that a black majority of 60% in some sub-districts was reasonable to remedy the Section 2 violation.

The Plaintiffs' expert, Dr. Allen Lichtman, testified that a black majority of 68.5% was needed in order to enable black voters to elect a candidate of their choice since there is lower voter registration among Blacks. The Plaintiffs proposed that this Court take judicial notice of the opinion regarding voter registration in *PUSH v. Allain*, 674 F.Supp. 1245 (N.D. Miss.1987). Since that decision was not a final judgment and has not been subject to appeal, the Court declined to take judicial notice. *See* Order of July 21, 1988. The Court instead allowed the Plaintiffs to introduce the study of its expert, Dr. Lichtman, which had been presented in the *PUSH* case. (See Exh. P–53). Dr. Lichtman contended that the voter registration rates as reported in the Secretary of State's registration rolls and the United States Bureau of Census data were incorrect due to self-overreporting and irregular purging. Instead of relying on census data, he examined jury summonses and jury questionnaires returned to the Clerk's office for the United States District Court for the Northern District of Mississippi. His study indicated that only 54% of the black voting age population was registered while 79% of the white voting age population was registered, indicating a 25% gap in registration rates. Lichtman found a small narrowing in this gap in 1985 when there was a 22% difference in registration rates between the races. The Court notes that this study, although apparently accepted by the Northern District of Mississippi, is the only study of its kind ever done.

As set forth above, the results of recent elections show that Blacks have won elec-

tions in this region and have done so with considerably less than a 68.5% or a 65% black majority population. The Court has considered the novelty of Lichtman's study and finds that it does not reconcile with voter registration drives in recent years and the increasing success of black candidates as revealed by the evidence.

■ Although the normal guideline for remedying a Section 2 violation is a 65% black majority population, that is only a guideline and the Court must make a specific inquiry as to what may properly give the minority an equal opportunity to elect candidates of their choice. It is evident that black voters in the State of Mississippi have gained ground and have overcome past obstacles of fear and intimidation at the polls. In view of the difficulty of dividing some areas to create 65% black majority sub-districts, the Court finds an adequate remedy can be obtained by designing at least one 60% or greater black majority sub-district for election purposes in each judicial district. Of course, the Court must be district-specific when formulating a remedy.

■ The Plaintiffs criticized the Court's concern as expressed in its draft opinion with packing high black majorities into any sub-district and presented alternate plans drawn by Henry Kirksey. The Plaintiffs attacked the Court's proposed criterion that the Court should limit any "packing" of Blacks into one subdivision in each district to avoid any increased racial conflicts. In his second set of sub-district plans, Kirksey drew essentially the same sub-district boundaries presented in his first plans but merely used the current county precinct lines rather than the 1980 legislative precinct lines. The sole purpose of Kirksey's Plans was to increase the size of the black majorities in the sub-districts to create super-majority sub-districts. This is an easy approach in a legislative case, but this Court believes there are distinctions in judicial cases as noted in Section II of this opinion. The Plaintiffs sought to guarantee election of black candidates in some sub-districts, but Section 2 only allows for an equal opportunity to elect rather than a guarantee. Kirksey's Plans split towns and counties and make odd-shaped sub-districts. Kirksey admittedly did not follow the Court's criteria. The Court finds Kirksey's Plans unacceptable. The Court believes an adequate remedy can be obtained by following the Court's objective criteria in drawing sub-districts.

■ Another criticism by the Plaintiffs of the court-appointed expert's plans was the manner in which he split "adjacent black majority precincts." The Plaintiffs defined "adjacent black majority precincts" as those precincts which abutted each other and which had at least a 65% black population. The Court finds that both O'Hare and Kirksey, as well as Little, separated some black majority precincts from each other when drawing their plans for sub-districts when it suited their purposes. As an example, the Plaintiffs carved out portions of some counties and combined them with other counties asserting they believed that the carved-out portions had a community of interest with adjacent black precincts in the next county. The Court believes the community of interest of the carved-out precincts lies more closely with their own county rather than with black majority precincts across county lines. The Court finds that the presence of a 65% black majority is not the sole measure of a community of interest. The Court finds that separating adjacent black majority precincts is not a valid criticism by which to reject outright Little's Plans.

Kirksey objected to the criteria regarding the Court's hesitation to split towns and counties. Kirksey testified that towns and counties should be split in order to remedy a Section 2 violation; he did not, however, testify as to what criteria or basis he would follow to remedy a Section 2 violation.

■ The Court permitted the Plaintiffs to reopen the evidence in the remedy phase to present proof of alternative voting remedies instead of single-member sub-districts. The Plaintiffs, through the testimony of Dr. Richard Engstrom, introduced evidence of a limited voting procedure. (See Exh. P–22). Under this procedure for multi-

member districts, the voters are allocated fewer votes than there are judgeships to be filled. In judicial districts with two judgeships the voters may vote for only one candidate. Likewise, in judicial districts with three judgeships, Engstrom testified the voters may cast a vote for only one candidate. This is referred to as a single, non-transferrable vote system. In judicial districts with four judgeships, the voters may vote for any two candidates; this is a double non-transferrable vote. Dr. Engstrom testified that this method remedies minority vote dilution by eliminating submergence of a cohesive minority group. Limited voting has been used in Connecticut and Pennsylvania, primarily in municipalities for electing city council members. Limited voting is also used to some extent in Japan and Spain, and has recently been adopted by consent decrees in cases in Alabama and North Carolina.

The Court has considered the alternative remedy of limited voting, and declines to accept it as a remedy for the Section 2 violations found in this case. The Court finds that limited voting is experimental and contrary to most election laws of Mississippi and the policy contained therein. It is also contrary to most general concepts of a democratic two-party system. The Court finds there is an adequate remedy in single-member sub-districts without imposing a radically new, judge-made process. Single-member sub-districts are usually favored by the courts in remedying a Section 2 violation.

## IV. COURT–APPROVED PLAN WITH DISTRICT–BY–DISTRICT ANALYSIS

The Court has considered the plans of its expert Little which closely followed the Court's objective criteria. The Court has also considered the plans of the Plaintiffs' expert, O'Hare. O'Hare attempted to follow the Court's criteria and offered suggestions in an objective manner which were helpful to the Court. The Court finds that some suggestions are in fact acceptable and it will modify somewhat Little's Plans. A description of the sub-districts will be set forth in Appendix A hereto. The Court has noted that plans drawn by Henry Kirksey did not attempt to follow the criteria and were not acceptable.

2. The original plan for each district designed by Little was admitted into evidence as a part of Exhibit C–1. O'Hare prepared maps of the Little Plan for each district and colored those precincts containing black populations of 65% or

The Court will make a district-by-district analysis of the Court's remedy in order to comply with the requirement that any remedy must be district specific.

### (a) *Eleventh Circuit Court District*

The Eleventh Circuit Court District consists of Bolivar, Coahoma, Tunica and Quitman counties. There are two judgeships in this district. It is largely rural and agricultural in nature. The only sizable population concentrations are in Cleveland in Bolivar County and Clarksdale in Coahoma County. 63.06% of the district population is Black.

Because of the relatively larger population of Bolivar County to that of Tunica and Quitman Counties, in order to comply with the maximum range of deviation and compactness criteria it is necessary for at least part of the population of Clarksdale to be included in a sub-district with Tunica County and Quitman County. Each of the experts in the formulation of his plan followed this general formula. The Little Plan, contained in Exhibits C–1 and P–37 [2] divides the district into two sub-districts with Subdistrict 1 consisting of Bolivar County plus portions of Coahoma County lying south and west of Clarksdale. All of Clarksdale and the northern part of Coahoma County is included with Tunica and Quitman Counties in Subdistrict 2. That plan results in a black population in Subdistrict 1 of 62.60% and in Subdistrict 2 of 63.50%.

The O'Hare Plan, Exhibit 38, modifies the Little Plan by moving five precincts from one subdistrict to another. O'Hare's primary purpose is to raise the black population percentage in Subdistrict 1. That is accomplished by moving the precinct known as Clarksdale No. 4 from Subdistrict 2 to Subdistrict 1. Since this move overbalances the population in Subdistrict 1, O'Hare then moves four rural precincts from Subdistrict 1 in the Little Plan to Subdistrict 2. The resulting percentages of black populations under the O'Hare Plan are 66.42% for Subdistrict 1 and 59.42% for Subdistrict 2.

The Kirksey Plan, Exhibit P–51, places all of Coahoma County in Subdistrict 2 except for one rural precinct and two pre-

more. Those colored maps were received into evidence as Plaintiffs' exhibits and are useful in following this Opinion and the criticisms of the Little plans made by O'Hare.

**338**

cincts lying largely within the city of Clarksdale. The Kirksey Plan, has a black population in Subdistrict 1 of 58.2% and in Subdistrict 2 of 67.9%.

The O'Hare Report, Exhibit P–27, criticized the Little Plan primarily because it divided adjacent precincts containing 65% or more black populations. The Plaintiffs also criticized the Little Plan on the basis that the percentage of black population in Subdistrict 2 was not high enough to remedy the Section 2 violation. On the other hand, the O'Hare Plan also divides 65% black precincts between the subdistricts but more importantly it divides Clarksdale. The Kirksey Plan likewise divides Clarksdale, but to an even more marked degree, and also attaches a narrow finger to Bolivar County consisting of one rural precinct of Coahoma County and two precincts within the city of Clarksdale so that compactness is destroyed and so that the appearance of a gerrymander is given.

The Court, after consideration of all of the plans presented to it, was not satisfied with any particular plan and has developed its own plan which places all of Clarksdale plus three rural precincts of Coahoma County in Subdistrict 2 with Tunica and Quitman Counties. This plan divides only one of the four counties in the district, does not divide Clarksdale, keeps all except one of the county precincts of Coahoma County with black populations of 65% or more in one subdistrict and results in a black population in Subdistrict 1 of 64.60% and in Subdistrict 2 of 61.36%. As set forth above, Blacks have been elected to a number of positions within this district from election districts containing black majorities of less than 65% (Henderson, 63.98%; Holman, 61.64%; Simmons, 62.15%; Thompson, 64.01%, Wright, 55.98%; and Brown, 59.13% *see* n. 1). The Court's Plan meets the remaining criteria set forth in this opinion. Statistical tables setting forth total population figures and variances, population by race and population by race in each individual precinct are attached as Appendix B, Exhibit 1, Tables A–D.**

The Court finds that the court plan will remedy the Section 2 violations in the Eleventh Circuit Court District.

### (b) *Seventh Chancery Court District*

The Seventh Chancery Court District consists of the same counties as the Elev-

enth Circuit Court District, Bolivar, Coahoma, Tunica and Quitman, plus Tallahatchie and Leflore Counties. There are two judgeships in the district. It is largely rural and agricultural in nature. Tallahatchie County has no sizeable population concentrations but there is a sizeable population concentration in Greenwood in Leflore County, Mississippi. 61.46% of the district population is black.

Because of the population concentrations in Bolivar, Coahoma and Leflore Counties and because of the geographic configuration of the district, the Little Plan, Exhibit C–1, divides the district into Subdistrict 1 consisting of Bolivar and Coahoma Counties and Subdistrict 2 consisting of Tunica, Quitman, Tallahatchie and Leflore Counties. The subdistricts accordingly are divided along county lines and are compact and contiguous. The Little Plan results in a black population in Subdistrict 1 of 59.90% and in Subdistrict 2 of 62.98%.

There was no O'Hare Plan for the Seventh Chancery Court District.

The Kirksey Plan, Exhibit P–46, places most of Clarksdale in Subdistrict 2 and moves Tunica County from Subdistrict 2 to Subdistrict 1. This results in a black population for his Subdistrict 1 of 67.3% and for his Subdistrict 2 of 55.6%. The Kirksey Plan division of Clarksdale results in an extremely odd configuration. It separates most of Clarksdale, the county seat of Coahoma County, from its community of interest with Coahoma County and is neither contiguous nor compact.

The Little Plan conforms with the criteria set forth in this Opinion. The Court notes as it did in regard to the Eleventh Circuit Court District above that Blacks have been elected to a number of positions within this district from election districts containing black majorities of less than 65%. (Henderson, 63.98%; Holman, 61.64%; Simmons, 62.15%; Thompson, 64.01%, Wright, 55.98%; and Brown, 59.13% *see* n. 1). Statistical tables for the Little Plan are attached as Appendix B, Exhibit 2, Tables A and B.

The Court finds that the Little Plan will remedy the Section 2 violations in the Seventh Chancery Court District and hereby adopts that plan as the plan of the Court.

### (c) *Fourth Circuit Court District*

The Fourth Circuit Court District consists of Washington, Sunflower, Leflore,

** Editor's Note: At the request of the Court, Appendix B has been omitted from publication.

Holmes and Humphreys Counties. There are three judgeships in this district. It is largely rural and agricultural in nature. The only sizeable population concentrations are in Greenville in Washington County, Indianola in Sunflower County and Greenwood in Leflore County, with Greenville being much larger than any of the rest of the cities in the district. 60.20% of the district population is black.

Because Greenville has a population so much greater than that of any other parts of this district, it is necessary to divide Washington County. The Little Plan for this District, Exhibit C–1, P.34, does that with a basically north/south line around the east city limits of Greenville which then follows county precinct lines thereafter. The result of the Little Plan is to include in Subdistrict 1 all of Sunflower and Humphreys Counties and the east half of Washington County; in Subdistrict 2 the west half of Washington County, including all of Greenville; and in Subdistrict 3 all of Leflore and Holmes Counties. The district accordingly is divided so that four out of the five counties remain whole. The Little Plan results in a black population in Subdistrict 1 of 63.26%, in Subdistrict 2 of 53.06%, and in Subdistrict 3 of 63.40%.

There was no O'Hare Plan presented for the Fourth Circuit Court District.

The Kirksey Plan, Exhibit P–49, in order to achieve a high black population concentration in at least one subdistrict, divides three counties, Washington, Sunflower and Leflore, and three cities, Greenville, Indianola and Greenwood, each of which is a county seat. The Kirksey Plan, has a black population in his Subdistrict 1 of 42.7%, in his Subdistrict 2 of 66.1% and in his Subdistrict 3 of 71.6%.

The Little Plan meets the criteria set forth in this Opinion. As set forth above, Blacks have been elected to a number of positions within the district from election districts containing black majorities of less than 65%. (Brown, 59.13%; Holmes, 63.4%; Johnson, 59.83%; Parker, 59.89%; Stapleton, 49.13%; Turner, 56.4%; and Young, 54.2%; see n. 1). Statistical tables regarding the Fourth Circuit Court District are attached as Appendix B, Exhibit 3, Tables A and B.

The Court finds that the Little Plan will remedy the Section 2 violations in the Fourth Circuit Court District and hereby adopts that plan as the plan of the Court.

(d) *Ninth Chancery Court District*

The Ninth Chancery Court District consists of Washington, Sunflower, Humphreys, Sharkey, Issaquena and Warren Counties. There are two judgeships in this district. It is largely rural and agricultural in nature except for population centers in Greenville in Washington County and Vicksburg in Warren County. Indianola in Sunflower County is the third largest population center. Sharkey and Issaquena Counties have extremely small populations. 52.70% of the district population is black.

Because of the large population centers in Vicksburg and Greenville which are at opposite ends of the district, in order to comply with the maximum range deviation and compactness criteria there must be a division of the district into northern and southern parts. Each of the experts in the formulation of his plan did this. The Little Plan, Exhibits C–1 and P–30, divides the District into two subdistricts with Subdistrict 1 consisting of Sunflower County plus the eastern and northern portions of Washington County, including a portion of Greenville, and Subdistrict 2 consisting of the remainder of Greenville and Washington County plus Humphreys, Sharkey, Issaquena and Warren Counties. That plan results in a black population in Subdistrict 1 of 62.31% and in Subdistrict 2 of 42.90%.

The O'Hare Plan modifies the Little Plan by exchanging two precincts within Greenville in Subdistrict 2 for one precinct in Greenville and one in Washington County in Subdistrict 1. The purpose of O'Hare's modifications to the Little Plan is to raise the black population percentage in Subdistrict 1 and to avoid the major criticisms of the Little Plan as expressed in the O'Hare Report, Exhibit P–27, that being that adjacent black precincts containing 65% or more black populations within the city of Greenville are divided. The resulting percentages of black populations under the O'Hare Plan are 67.92% for Subdistrict 1 and 37.04% for Subdistrict 2.

The Kirksey Plan divides Greenville in the same fashion as does the O'Hare Plan but includes Humphreys County in Subdistrict 1. The Kirksey Plan has black population in Subdistrict 1 of 67.9% and Subdistrict 2 of 37.0%.

At the July 11, 1988, hearing Mr. Little testified that his plan presented as Plaintiffs' Exhibit P–30 had been designated by him during his studies as Plan D. He

testified as to another plan which he had prepared for comparison purposes which he designated as Plan B. That plan appeared to the Court to more properly provide a remedy of the Section 2 violations and in general principal has been adopted as the plan of the Court.

Little's Plan D, Exhibit P–30, divides precincts within Greenville with heavy black populations. In addition, its very appearance is that of a gerrymander with its extremely irregular boundaries within the city of Greenville. The plan as adopted by the Court insofar as its division of Greenville is very similar to the plans offered by both O'Hare and Kirksey. The Court's Plan uses precinct lines as boundaries but also uses Reed Road, Highway 82, and an extension of Reed Road, major arteries within Greenville, for designation of the boundaries between Subdistricts 1 and 2. The Court's Plan does not split any precincts containing 65% or higher black populations. The Court's Plan also uses the same boundary line for a division between Subdistricts 1 and 2 within Washington County outside of and south of Greenville as is used for a division between Subdistricts 1 and 2 in the Fourth Circuit Court District.

In comparison with the Court's Plan, the O'Hare Plan follows fewer major arteries within Greenville, does not conform the boundary lines within the circuit and chancery court districts and separates the heavily black county precinct 5/1 from the heavily black precincts 5/2 and 2/4.

The Court's Plan meets the remaining criteria set forth in this opinion. Statistical tables are attached as Appendix B, Exhibit 4, Tables A–D.

The Court finds that the Court Plan will remedy the Section 2 violations in the Ninth Chancery District.

### (e) *Eleventh Chancery Court District*

The Eleventh Chancery Court District consists of Holmes, Yazoo, Madison and Leake Counties. There are two judgeships in this district. It is largely rural and agricultural in nature except for the southern part of Madison County which has become a commercial and retail center and a bedroom community for adjacent Jackson. Population concentrations are in Yazoo City in Yazoo County, in Canton in Madison County, and in the Madison–Ridgeland area of Madison County. 54.37% of the district population is black.

The Little Plan, Exhibits C–1 and P–32, divides the district into two subdistricts with Subdistrict 1 consisting of all of Holmes and Yazoo Counties and the three southwesternmost precincts of Madison County. Subdistrict 2 consists of the remainder of Madison County and Leake County. The Little Plan results in a black population in Subdistrict 1 of 60.11% and in Subdistrict 2 of 48.90%.

The O'Hare Plan, Exhibit P–38, places the northernmost precincts of Madison County plus a substantial portion of Canton into Subdistrict 1 with Yazoo and Holmes Counties and places the remainder of Madison County in Subdistrict 2 with Leake County. The primary purpose of O'Hare's Plan is to raise the black population percentage in Subdistrict 1. The resulting percentages of black populations under the O'Hare Plan are 64.48% for Subdistrict 1 and 42.42% for Subdistrict 2.

The Kirksey Plan, Exhibit P–48, divides both Yazoo and Madison Counties and both Yazoo City and Canton and places the northern half of Yazoo County, including the northern half of Yazoo City, and the northern half of Madison County, including the northern half of Canton, in Subdistrict 1 with Holmes County and the southern half of Yazoo County, including the southern half of Yazoo City, and the southern half of Madison County, including the southern half of Canton, in Subdistrict 2 with Leake County. The Kirksey Plan has a black population in Subdistrict 1 of 70.1% and in Subdistrict 2 of 39.0%.

The O'Hare report, P–27, criticizes the Little Plan because it separates Magnolia Heights Precinct from Gluckstadt Precinct, both of which have black populations in excess of 65%. However, the precincts are not contiguous and it is obvious that the only purpose of the O'Hare Plan is to raise the black percentage in Subdistrict 1. This is accomplished by dividing Canton, the county seat of Madison County, and placing the northern part of Madison County, including the northern part of Canton with Yazoo and Holmes Counties on the premise that the plan does not separate the black precincts in northern Madison County from the black precincts across the Big Black River in Yazoo County which form a community of interest. This argument is not accepted by the Court. The Court believes that the black precincts in northern Madison County have more of a community of interest with the rest of Madison County than with Yazoo County. The Court notes

also that the O'Hare Plan separates the black precinct of Farmhaven from the other black precincts in northern Madison County and separates black precincts within Canton.

The Court is thus faced with the choice of either following a nonsensical plan which violates several of the criteria of this Opinion in order to raise the black percentage in Subdistrict 1 or to follow the Little Plan which keeps whole three out of the four counties in the district and leaves almost all of Madison County intact. The Court notes that the Little Plan also does not split any 65% or more black precincts from each other except along county lines and that it keeps the Madison County precincts through which Highway 49 runs in the same subdistrict with Yazoo County through which that highway also runs. As set forth above, Blacks have been elected to positions within the district from election districts containing black majorities of less than 65% (Anderson, 45.36% and Leach, 62.4%). The Little Plan meets the remaining criteria set forth in this Opinion. Statistical tables for the Little Plan are attached as Appendix B, Exhibit 5, Tables A and B.

The Court finds that the Little Plan will remedy the Section 2 violations in the Eleventh Chancery Court District and hereby adopts that plan as the plan of the Court.

## (f) *Seventh Circuit Court District*

The Seventh Circuit Court District consists of Yazoo and Hinds Counties. There are four judgeships in this district. Yazoo County is largely agricultural in nature with Yazoo City being the only sizeable population concentration. Hinds County contains Jackson, which is the largest metropolitan area in the state. The population of Jackson dominates the entire district and covers approximately the east one-third of Hinds County. The balance of Hinds County is largely rural and agricultural in nature containing population concentrations in Clinton and Raymond. Hinds County is divided into two judicial districts for state action venue purposes with Jackson being the county seat in one district and Raymond being the county seat in the other. 45.76% of the district population is black.

Because Jackson has a population so much greater than that of any other part of this district, is it necessary to divide Jackson. The Little Plan, Exhibit C–1 and P–35, divides the district into four subdistricts. Subdistrict 1 consists of the almost total white northeast Jackson, the east part of downtown Jackson and the southeast part of Jackson, thus making a strip down the east side of Jackson following along the Pearl River. Subdistrict 2 consists of all Yazoo County plus the northwest part of Jackson and four rural precincts lying along the northern part of Hinds County. The portion of Subdistrict 2 lying within Hinds County is heavily black. Subdistrict 3 consists of the heavily black intercity portion of Jackson. Subdistrict 4 consists of the remainder of Hinds County, including Clinton and Raymond. That plan results in a black population in Subdistrict 1 of 21.86%, in Subdistrict 2 of 59.26%, in Subdistrict 3 of 69.12% and in Subdistrict 4 of 32.63%.

The O'Hare Plan follows the same basic concept of placing the heavily white portion of Jackson which lies along the Pearl River in Subdistrict 1 and heavily black intercity portion of Jackson in Subdistrict 3. The O'Hare Plan, however, in order to increase the black percentage in Subdistrict 2 changes the Little Plan by moving seven predominately white precincts from Subdistrict 2 to Subdistrict 1 and five predominately black precincts from Subdistrict 1 to Subdistrict 3. The resulting percentages of black populations under the O'Hare Plan are 8.30% for Subdistrict 1, 73.48% for Subdistrict 2, 69.61% for Subdistrict 3, and 32.63% for Subdistrict 4.

The Kirksey Plan, Exhibit P–50, follows the same general format as the other two plans, but by shifting a relatively small number of precincts from one district to the other, reaches a plan with resulting percentages of black populations of 19.7% for Subdistrict 1, 73.7% for Subdistrict 2, 69.6% for Subdistrict 3, and 19.9% for Subdistrict 4.

In analyzing the plans presented to it, the Court notes that the O'Hare Plan moves boundary lines between Subdistricts 1 and 2 off of State Street and I–55, two major thoroughfares. The O'Hare Plan moves the line between Subdistricts 1 and 3 off of Bailey Avenue, a major thoroughfare. The rationale for this was that Precincts 2, 4 and 10 contain black populations in excess of 65% and that the Little Plan splits them from the black community of interest contained in the rest of Subdistrict 3. The Court, however, from observation, notes that Precincts 5 and 6, which are east of and adjacent to Precincts 2, 4 and 10,

have heavy black concentrations west of Northwest Street and have heavy white populations east of Northwest Street. Accordingly, regardless of how drawn subdistrict lines through that area will divide some substantial black populations from others. The O'Hare Plan provides less coordination with the subdistrict lines for his Fifth Chancery Court Plan and his Hinds County Court plan. The O'Hare Plan creates a super-majority white subdistrict in Subdistrict 1 with only an 8.3% black population. The Little Plan, on the other hand, balances the black population among all four subdistricts while creating two black majority subdistricts. It uses more major thoroughfares as dividing lines and it more closely coordinates the subdistrict lines with those in the Little Plans for the Fifth Chancery Court District and the Hinds County Court District.

A primary criticism of the Little Plan made by the O'Hare Report, Exhibit P–27, was that the 65% or more black Precincts 63 and 64 are split from adjacent heavily black adjacent precincts. The Court believes that that criticism is a valid criticism and has modified the Little Plan by moving Precincts 63 and 64 from Subdistrict 1 to Subdistrict 3. This modification makes Terry Road, a major thoroughfare, a consistent boundary between Subdistricts 1 and 3 as it is under the Little Fifth Chancery Court District Plan and the Little Hinds County Court Plan. The Little Plan, as modified by the Court, results in a black population in Subdistrict 1 of 16.85%, in Subdistrict 2 of 59.26%, in Subdistrict 3 of 70.88% and in Subdistrict 4 of 32.63%. As noted above, Blacks have been elected to positions within the district from election districts containing black majorities of less than 65%. (Anderson, 45.36% and Leach, 62.4%). The Little Plan, as modified by the Court, meets the remaining criteria set forth in this Opinion. Statistical tables for the Little Plan, as modified, are attached as Appendix B, Exhibit 6, Tables A–F.

The Court finds that the Little Plan as modified by the Court will remedy the Section 2 violations in the Seventh Circuit Court District and hereby adopts that plan, as modified, as the plan of the Court.

(g) *Fifth Chancery Court District*

The Fifth Chancery Court District consists of Hinds County. There are four judgeships in this district. The Fifth Chancery Court District has the same characteristics as the Seventh Circuit District except that Yazoo County is not included in it. Because the population of Yazoo County as compared with that of Hinds County is small, the same basic concept is used by the Little Plan in a division of Jackson in the Fifth Chancery Court District as is used in his Seventh Circuit Court District. The Little Plan, Exhibits C–1 and P–28, places the east portion of Jackson lying along the Pearl River in Subdistrict 1, north Jackson and the rural precincts in north Hinds County in Subdistrict 2, the intercity Jackson in Subdistrict 3, and the remainder of the county in Subdistrict 4. The Little Plan has a black population of 22.76% in Subdistrict 1, of 67.13% in Subdistrict 2, of 59.51% in Subdistrict 3, and of 32.71% in Subdistrict 4.

The O'Hare Report, Exhibit P–27, criticizes the Little Plan primarily for separating predominately black precincts. The O'Hare Plan modifies the Little Plan by shifting a number of precincts from one subdistrict to the other. The O'Hare Plan results in a black population in Subdistrict 1 of 5.38%, in Subdistrict 2 of 72.06%, in Subdistrict 3 of 77.60%, and in Subdistrict 4 of 64.91%.

The Kirksey Plan results in a black population for his Subdistrict 1 of 5%, for his Subdistrict 2 of 74.7%, for his Subdistrict 3 of 71.4% and for his Subdistrict 4 of 28.9%.

The Court, after considering all the plans presented to it, feels that the Little Plan more closely meets the criteria set forth in this Opinion. The O'Hare Plan creates a supermajority white subdistrict in Subdistrict 1, leaving only 5.38% black population. The small black population in Subdistrict 1 violates one of the criteria heretofore set forth in this Opinion. It departs from using Woodrow Wilson Avenue and I–55, both major thoroughfares, as a division line between Subdistricts 1 and 2 and departs from Bailey Avenue, a major thoroughfare, while still splitting the black communities lying west of Northwest Street in Precincts 5 and 6 as discussed under the Seventh Circuit Court District. It splits southeast Jackson, which is a community of interest, and it splits Clinton. The Little Plan, on the other hand, balances black population among all four subdistricts while creating two black majority subdistricts. It uses

more major thoroughfares as dividing lines and it coordinates the subdistrict lines better with his plans for the Seventh Circuit Court District and the Hinds County Court District.

The Court accepts as valid the criticism of the Little Plan for including Precincts 63 and 64 in Subdistrict 1 and accordingly will modify the Little Plan by moving Precincts 63 and 63 from Subdistrict 3 to Subdistrict 1. The Court finds that the Little Plan, as modified, conforms with the criteria set forth in this Opinion. Blacks have been elected from this district as noted above. The modified Little Plan results in a black population in Subdistrict 1 of 17.54%, in Subdistrict 2 of 67.13%, in Subdistrict 3 of 61.95% and in Subdistrict 4 of 32.71%. Statistical tables for the Little Plan as modified are attached as Appendix B, Exhibit 7, Tables A–F.

The Court finds that the Little Plan, as modified, will remedy the Section 2 violations in the Fifth Chancery Court District and hereby adopts that plan, as modified, as the plan of the Court.

(h) *Hinds County Court*

The Hinds County Court District consists of Hinds County. There are three judgeships in this district. Its characteristics have been set forth above in the discussions of the Seventh Circuit Court District and the Fifth Chancery Court District. 45.14% of the district is black.

The Little Plan attempted to coordinate subdistrict lines as much as possible with the circuit and chancery court districts involving Hinds County. It also attempted to preserve as much as possible as a common district the heavily black intercity portion of Jackson. Because only three districts are involved in the county court plan, substantial adjustments have to be made when compared to the Circuit and Chancery Court plans. Little combines northeast Jackson and north Jackson into Subdistrict 1, uses the intercity as Subdistrict 2 and uses the balance of Hinds County as Subdistrict 3. The Little Plan has a black population in Subdistrict 1 of 42.70%, in Subdistrict 2 of 67% and in Subdistrict 3 of 27.18%.

The O'Hare report, Exhibit P–27, criticizes the Little Plan for splitting predominately black precincts and moves a number of the precincts from one subdistrict to another. The Court notes, however, that the O'Hare Plan also splits black precincts. O'Hare Plan results in black populations of 35.61% in Subdistrict 1, of 72.61% in Subdistrict 2, of 26.66% in Subdistrict 3.

The Kirksey Plan is another approach using the same basic concepts. The Kirksey Plan results in black populations of 51.3% in Subdistrict 1, of 70.3% in Subdistrict 2 and of 49.7% in Subdistrict 3.

In analyzing the three plans the Court has before it, the Court notes that the O'Hare Plan cures only six of the fourteen separations of predominately black precincts, which is analytically inconsistent with the O'Hare policy of doing away with such separations. The O'Hare Plan moves the boundary line between Subdistricts 1 and 2 off of Bailey Avenue, a major thoroughfare, and off of Terry Road, a major thoroughfare. Subdistrict 1 is not compact. The O'Hare Plan splits south Jackson three ways instead of two ways. On the other hand, the Little Plan uses more major thoroughfares as dividing lines, coordinates the Hinds County Court District subdistrict lines more closely with the subdistrict lines of the Fifth Chancery Court District and of the Seventh Circuit Court District, is more compact and splits south Jackson between only two subdistricts instead of three. The Little Plan conforms more closely with the other criteria set forth above in this Opinion than any of the other plans. Statistical tables regarding the Little Plan for the Hinds County Court District are attached as Appendix B, Exhibit 8, Tables A–E.

The Court finds that the Little Plan will remedy the Section 2 violations in the Hinds County Court District and hereby adopts that plan as the plan of the Court.

## V. ELECTION SCHEDULE

The Plaintiffs have asked this Court to implement the remedies ordered herein setting elections implementing this remedy on November 8, 1988, in conjunction with the scheduled presidential and congressional elections. The Court finds it cannot grant that request for the following reasons.

State policy of Mississippi is expressed in laws establishing election schedules. Phil

Carter of the Mississippi Secretary of State's office testified that under the state election law there is a 60–day mandatory period between the qualification date of candidates and the date of the party primaries. There is a three-week period for any run-offs. There is an additional 60–day period from the time these primary winners, the party nominees, are certified until the date a general election may be scheduled. Accordingly, to hold judicial elections in accordance with state law requires a minimum of 141 days.

The Plaintiffs have suggested an interim remedy for the 1988 November elections in which there would be no primaries and in which the number of top vote getters which corresponds to the number of available judgeships in each district would be declared the winners. The Court finds that it should not order such a special remedy but that it should follow the state policy of using party primaries in judicial elections. See Miss.Code Ann. § 23–15–1013 (Supp. 1987).

The Court does not believe it should compress the time for primaries and a general election. Since attorneys, if elected, will have to give up their law practices, the decision to stand for election to a judgeship will be a major decision for many. These attorneys should be given a fair chance to make that decision and conduct adequate campaigns. This Court declines to place severe time restrictions on the candidates' ability to raise money or conduct a full campaign.

The public also needs adequate time before elections are conducted. The information concerning the major changes required by this Order must be disseminated and the public needs sufficient time to become familiar with the candidates. Holding judicial party primaries with the presidential and congressional general election on November 8, 1988, would result in voter confusion at the polls and also conflict with state policy of separating judicial elections from presidential or gubernatorial elections. See Miss.Code Ann. § 23–15–1013 to –1015 (Supp.1987). The Court will not schedule party primaries for judicial elections for November 8, 1988.

The Court instead directs that judicial elections be conducted in accordance with time periods established by state law in the districts found in violation of Section 2 of the Voting Rights Act with primaries to be held in February, 1989. The Court directs the parties to reach an agreed order for the scheduling of qualification of candidates, primaries, run-offs if required, and general elections. In the event the parties are unable to agree to a time table within ten days of this Order, this Court will order such a time table on its own.

## VI. LIFTING OF INJUNCTION

On May 28, 1986, this Court issued an injunction enjoining the holding of all judicial elections in the State of Mississippi. The purpose of the state-wide injunction was to avoid confusion until a determination could be made as to which of the districts alleged by Plaintiffs to be in violation of Section 2 of the Voting Rights Act were in fact in violation. Further confusion was also being caused by the fact that the Three Judge Court in this cause on April 3, 1986, had entered an injunction enjoining the elections in certain judicial districts which it had determined were in violation of Section 5 of the Voting Rights Act. Of the forty circuit and chancery districts in Mississippi, fourteen have not been found to be in violation of either Section 2 or Section 5.[3] Two districts were found by this Court to be in violation of Section 2 but are not covered by the injunction of the Three Judge Court.[4] Accordingly, the lifting of the injunction of this Court as hereinafter ordered will clear the holding of elections in those sixteen districts.

The injunction of this Court dated May 28, 1986, also enjoined the holding of elections for county judge in Harrison, Hinds and Jackson Counties. This Court thereafter held Harrison and Jackson Counties not to be in violation of Section 2 of the Voting Rights Act. The injunction of this Court will be lifted as to elections for county judge in these three counties. The Three Judge Court enjoined the holding of

---

3. Sixth, Eighth, Twelfth, Thirteenth, Fourteenth and Eighteenth Circuit Court Districts and Second, Fourth, Eighth, Thirteenth, Fifteenth, Seventeenth, Nineteenth and Twentieth Chancery Court Districts.

4. Seventh Circuit Court District and Fifth Chancery Court District.

elections for county judge in Harrison, Jackson, Madison and Washington Counties after finding Section 5 violations.

Of the remaining twenty-four circuit and chancery court districts, five [5] have been found to be in violation of Section 2 by this Court and of Section 5 by the Three Judge Court and nineteen [6] have been found to be in violation of Section 5 by the Three Judge Court but not of Section 2 by this Court. Accordingly, the lifting of the injunction by this Court will still leave those twenty-four districts under the injunction of the Three Judge Court. If the Three Judge Court lifts its injunction as to any or all of those twenty-four remaining circuit or chancery court districts or four county court districts in time for elections to be held according to the schedule to be adopted by this Court under the directions of Section V of this Opinion, Defendants are directed to carry out such elections in any such districts along with the elections ordered for those districts not subject to the injunction of the Three Judge Court.

The Court, accordingly, will dissolve its injunction issued on May 28, 1986, and will order the holding of judicial elections in all circuit and chancery court districts in the State of Mississippi and in the Court Districts for Hinds, Harrison and Jackson Counties. Such elections shall be conducted according to the schedule adopted by the Court pursuant to its directions contained in Section V of this Opinion. Those elections shall be conducted in accordance with the election laws of the State of Mississippi except as modified by the dictates of this Opinion. The successful candidates in such elections shall take office on July 3, 1989, at which time such offices will be declared to be vacant. Such successful candidates shall hold office until their successors are duly elected in the next regularly scheduled judicial elections called for under the laws of the State of Mississippi and sworn into office on the date required by law.

The parties are directed to confer regarding the scheduling of elections as directed in Section V of this Opinion and to present to the Court on or before September 22, 1988, a final judgment incorporating both such election schedule and the relief granted under this Memorandum Opinion and Order.

## APPENDIX A
### Description of Subdistricts
#### ELEVENTH CIRCUIT COURT DISTRICT

Subdistrict 1
Bolivar County (All)
Coahoma County Precincts:
 Coahoma
 Lula
 Friars Point
 Jonestown
 Farrell
 Sherard
 Bobo
 Rena Lara
 Round

Subdistrict 2
Tunica County (All)
Quitman County (All)
Coahoma County Precincts:
 Cagles Crossing
 Mattson
 Lyon
 Clarksdale # 1
 Clarksdale # 2
 Clarksdale # 3
 Clarksdale # 4
 Clarksdale # 5

#### SEVENTH CHANCERY COURT DISTRICT

Subdistrict 1
Bolivar County (All)
Coahoma County (All)

Subdistrict 2
Tunica County (All)
Quitman County (All)
Tallahatchie County (All)
Leflore County (All)

#### FOURTH CIRCUIT COURT DISTRICT

| Subdistrict 1 | Subdistrict 2 | Subdistrict 3 |
| --- | --- | --- |
| Sunflower Co. (All) | Washington Co. Precincts: | Leflore Co. (All) |

**5.** Fourth and Eleventh Circuit Court Districts and Seventh, Ninth and Eleventh Chancery Court Districts.

**6.** First, Second, Third, Fifth, Ninth, Tenth, Fifteenth, Sixteenth, Seventeenth, Nineteenth and Twentieth Circuit Court District and First, Third, Sixth, Tenth, Twelfth, Fourteenth, Sixteenth, and Eighteenth Chancery Court Districts.

Subdistrict 1
Humphreys Co. (All)
Washington Co. Precincts:
 4/2 Leland Clinic
 4/3 Leland Light Plant
 2/4 Arcola City Hall
 5/1 Hollandale City Hall
 5/2 Darlove Baptist Ch.
 5/3 Bourbon Store

Subdistrict 2
1/1 Extension Building
1/2 Saint James Church
1/3 Swiftwater Church
1/4 Glen Allen Clinic
2/1 Ward's Rec. Center
2/2 B.B. Comm. Center
2/3 Avon Health Center
2/5 Faith Church
3/1 Italian Club
3/2 Brent Center
3/3 Wm. Percy Library
3/4 American Legion
3/5 Metcalfe City Hall
4/1 County Barn
5/4 Grace Methodist Church
5/5 Industrial College

Subdistrict 3
Humphreys Co. (All)

## NINTH CHANCERY COURT DISTRICT

Subdistrict 1
Sunflower County (All)
Washington County Precincts:
 1/1 Extension Building
 2/2 B.B. Comm. Center
 2/4 Arcola City Hall
 2/5 Faith Church
 3/2 Brent Center
 3/3 Wm. Percy Library
 3/4 American Legion
 3/5 Metcalfe City Hall
 4/1 County Barn
 4/2 Leland Clinic
 4/3 Leland Light Plant
 5/1 Hollandale City Hall
 5/2 Darlove Baptist Church
 5/3 Bourbon Store
 5/4 Grace Methodist Church
 5/5 Industrial College

Subdistrict 2
Humphreys County (All)
Issaquena County (All)
Sharkey County (All)
Warren County (All)
Washington County Precincts:
 1/2 Saint James Church
 1/3 Swiftwater Church
 1/4 Glen Allen Clinic
 2/1 Wards Recreational Center
 2/3 Avon Health Center
 3/1 Italian Club

## ELEVENTH CHANCERY COURT DISTRICT

Subdistrict 1
Holmes County (All)
Yazoo County (All)
Madison County Precincts:
Smith School
Flora
Magnolia Heights

Subdistrict 2
Leake County (All)
Madison County—(All except
 following precincts:)
 Smith School
 Flora
 Magnolia Heights

## SEVENTH CIRCUIT COURT DISTRICT

Subdistrict 1
Hinds County Precincts:

| | |
|---|---|
| 33 | 76 |
| 34 | 77 |
| 35 | 92 |
| 36 | 93 |
| 44 | 96 |
| 45 | 1 |
| 46 | 2 |
| 78 | 4 |
| 79 | 5 |
| 14 | 6 |
| 15 | 8 |

Subdistrict 2

Yazoo Co. (All)
Hinds County Precincts:

| | |
|---|---|
| 38 | 12 |
| 39 | 13 |
| 40 | 29 |
| 41 | 30 |
| 42 | 85 |
| 43 | 37 |
| 80 | 16 |
| 81 | |
| 82 | |

## Subdistrict 1
Hinds County Precincts:

| | |
|---|---|
| 17 | 9 |
| 72 | 32 |
| 73 | 47 |
| 74 | 97 |
| 75 | 10 |

## Subdistrict 3
Hinds County Precincts:

| | |
|---|---|
| 11 | 62 |
| 21 | 18 |
| 22 | 19 |
| 23 | 20 |
| 27 | 50 |
| 28 | 51 |
| 31 | 52 |
| 58 | 53 |
| 59 | 63 |
| 66 | 64 |
| 54 | 67 |
| 55 | 68 |
| 56 | 69 |
| 57 | 70 |
| 60 | 71 |
| 61 | 89 |

## Subdistrict 2

83
84
Brownsville
Cynthia
Pocahontas
Tinnin

## Subdistrict 4
Hinds County Precincts:

| | |
|---|---|
| Pinehaven | Chapel Hill |
| Byram | Dry Grove |
| Cayuga | Old Byram |
| Learned | Terry |
| Utica 1 | Bolton |
| Utica 2 | Edwards |
| 87 | 25 |
| 88 | 86 |
| 91 | 24 |
| Clinton (1–6) | 26 |
| Raymond 1 | 90 |
| Raymond 2 | 94 |
| Springridge | 95 |

## FIFTH CHANCERY COURT DISTRICT

## Subdistrict 1
Hinds County Precincts:

| | |
|---|---|
| 33 | 92 |
| 34 | 93 |
| 35 | 96 |
| 36 | 1 |
| 44 | 5 |
| 45 | 8 |
| 46 | 9 |
| 78 | 32 |
| 79 | 47 |
| 72 | 97 |
| 73 | 2 |
| 74 | 4 |
| 75 | 6 |
| 76 | 10 |
| 77 | |

## Subdistrict 2
Hinds County Precincts:

| | |
|---|---|
| 38 | 12 |
| 39 | 13 |
| 40 | 29 |
| 41 | 30 |
| 42 | 85 |
| 43 | 37 |
| 80 | 11 |
| 81 | 16 |
| 82 | 23 |
| 83 | 27 |
| 84 | 28 |
| Brownsville | 14 |
| Cynthia | 15 |
| Pocahontas | 17 |
| Tinnin | |

## Subdistrict 3
Hinds County Precincts:

| | |
|---|---|
| 58 | 51 |
| 59 | 52 |
| 66 | 53 |
| 54 | 67 |
| 55 | 68 |
| 56 | 69 |
| 57 | 70 |
| 60 | 71 |
| 61 | 21 |
| 62 | 22 |
| 63 | 31 |
| 64 | 89 |
| 18 | 24 |
| 19 | 25 |
| 20 | 26 |
| 50 | 86 |

## Subdistrict 4
Hinds County Precincts:

| | |
|---|---|
| Pinehaven | Raymond 2 |
| Byram | Springridge |
| Cayuga | Chapel Hill |
| Learned | Dry Grove |
| Utica 1 | Old Byram |
| Utica 2 | Terry |
| 87 | Bolton |
| 88 | Edwards |
| 91 | 90 |
| Clinton (1–6) | 94 |
| Raymond 1 | 95 |

## HINDS COUNTY COURT DISTRICT

| Subdistrict 1 | | Subdistrict 2 | |
|---|---|---|---|
| 33 | 84 | 11 | 26 |
| 34 | 12 | 21 | 54 |
| 35 | 13 | 22 | 55 |
| 36 | 14 | 23 | 56 |
| 37 | 15 | 25 | 57 |
| 38 | 16 | 27 | 60 |
| 39 | 17 | 28 | 61 |
| 40 | 29 | 31 | 62 |
| 41 | 30 | 86 | 18 |
| 42 | 1 | 58 | 19 |
| 43 | 2 | 59 | 20 |
| 44 | 4 | 66 | 50 |
| 45 | 5 | 67 | 51 |
| 46 | 6 | 68 | 52 |
| 78 | 8 | 69 | 53 |
| 79 | 9 | 70 | 63 |
| 80 | 32 | 71 | 64 |
| 81 | 85 | 24 | 89 |
| 82 | 10 | | |
| 83 | | | |

| Subdistrict 3 | |
|---|---|
| Brownsville | Cayuga |
| Cynthia | Learned |
| Pocahontas | Utica 1 |
| Tinnin | Utica 2 |
| Bolton | 87 |
| Edwards | 88 |
| Pinehaven | 90 |
| 72 | 91 |
| 73 | Clinton (1–6) |
| 74 | Raymond 1 |
| 75 | Raymond 2 |
| 76 | Springridge |
| 77 | 97 |
| 92 | Chapel Hill |
| 93 | Dry Grove |
| 94 | Old Byram |
| 95 | Terry |
| 96 | 47 |
| Byram | |

## ORDER CLARIFYING MEMORANDUM OPINION AND ORDER

The Court has before it the Motion of the Defendants for Clarification, Amendment or Alteration of the Court's September 12, 1988, Memorandum Opinion and Order. The Court has considered the Motion, together with the attachments thereto, the Plaintiffs' reply thereto, the State Defendants' rebuttal and the arguments made to the Court by the attorneys for all parties by way of a telephone conference held October 7, 1988. The Court notes that the suggested changes of a technical nature suggested in paragraphs 3, 4, 5, 6 and 7 of the Motion are not contested by the Plaintiffs, are well taken and will be granted.

The Court further notes that the Plaintiffs agree that there are precinct line changes which have recently been made in Washington County that affect the division of Greenville in regard to the Court's plan for the Ninth Chancery Court District. Plaintiffs agree with the State Defendants that in order to avoid confusion on the splitting of precincts that the Court should alter its plan for the Ninth Chancery Court District so that Washington County is divided along the new precinct lines. The Court has requested the parties to attempt to reach a stipulation regarding the population and racial make-ups of the new Washington County precincts and submit such a stipulation to the Court by October 14, 1988. The Court will then consider an alteration of its plan for the Ninth Chancery Court District as set forth in its Order of September 12, 1988.

The final issue presented in the State Defendants' Motion is a request to clarify the Court's Order of September 12, 1988, in regard to the ordering of elections in certain districts or in the alternative for a continuing injunction.

In Section VI Lifting of Injunctions beginning at page 45 of the Court's September 12, 1988, Memorandum Opinion and Order, the Court dissolved its statewide injunction prohibiting the holding of judicial elections but noted the continuing injunction of the Three Judge Court in the Section 5 portion of this lawsuit. The Three Judge Court has enjoined the holding of elections in certain districts for those judgeships created after the passage of the Voting Rights Act of 1964 as distinguished from the holding of all elections in those judicial districts containing such judgeships. Accordingly, but for this Court's general statewide injunction, there is one judgeship in each district covered by the injunction of the Three Judge Court which was not enjoined by that Court. The Districts in which this situation exists and which are not subject to this Court's remedy order under the Section 2 portion of the lawsuit are:

| Circuit Court | Chancery Court |
|---|---|
| District | District |
| First | First |
| Second | Third |
| Third | Sixth |
| Fifth | Tenth |
| Ninth | Twelfth |

| Circuit Court | Chancery Court |
|---|---|
| District | District |
| Tenth | Fourteenth |
| Fifteenth | Sixteenth |
| Sixteenth | Eighteenth |
| Seventeenth | |
| Nineteenth | |
| Twentieth | |

The Court accordingly clarifies its Order of September 12 by holding that the Order does, in fact, direct the holding of elections for the original judgeship which existed before 1964 in each of the above districts on the schedule to be adopted relative to the districts for which a Section 2 remedy has been ordered.

However, after considering the arguments of counsel for all parties, the Court believes that it should neither reinstate its injunction nor affirmatively direct the holding of elections in regard to those original judgeships at issue.

In order to direct the holding of elections for a single judgeship in those multiple judgeship districts, this Court would be required to designate which judgeship constituted the judgeship which existed in 1964. In some of the districts there are post residency requirements and this Court would of necessity be required to remove such post residency requirement if district-wide elections were ordered. The post system is now being litigated under Section 5 of the Voting Rights Act by the State of Mississippi in the District of Columbia. Elections of a single judgeship in multiple judgeship districts would cause considerable confusion among the electorate and among possible candidates. On the other hand, the Court has considered the position of the Plaintiffs that this Court enjoined those elections which would have been held two years ago and has thus prevented the populate from enjoying the opportunity of voting and, further, that the elections would be delayed another two years if not ordered. The Court notes, however, that in none of these districts has a Section 2 violation been found. Accordingly, in balancing the equities of the situation the Court concludes that elections should not be ordered in any of the above listed districts.